IN RE RENREN, INC. DERIVATIVE LITIGATION, Plaintiff,

against
XXX, Defendant.

Index No. 653594/2018

For the plaintiffs: Mark C. Zauderer and Jason Todd Cohen, Ganfer Shore Leeds & Zaudere LLP, 360 Lexington Ave, New York, NY 10017;
Jennifer Sarnelli and James S. Notis, Gardy & Notis, LLP, 126 E. 56th Street, 8th Floor, New York, NY 10022;
William Thomas Reid, Nathanial J. Palmer, and Jeffrey E. Gross, Reid Collins & Tsai LLP, 810 7th Ave., Suite 410, New York, NY 10019; and 
Michael David Bell, Grant & Eisenhofer, 123 Justin St., Wilmington, DE 19801
For nominal defendant Renren, Inc.: Christopher P. Malloy, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036 Telephone: (212) 735-3000
For Defendants David K. Chao; DCM III, L.P.; DCM III-A, L.P.; DCM Affiliates Fund III, L.P.; DCM Investment Management III, LLC: Brian E. Pastuszenski and Adam Slutsky, Goodwin Procter LLP, 620 Eighth Avenue, New York, NY 10018
For Defendant Duff & Phelps, LLC: James P. Smith III and Lisa C. Chan, Winston & Strawn LLP, 200 Park Avenue, New York, NY 10166, and Stephen V. D'Amore, Esq., Winston & Strawn LLP, 35 West Wacker Drive Chicago, Illinois 60601
For Defendants Joseph Chen and Oak Pacific Investment: M. Elias Berman and Greer Griffith, MCDERMOTT WILL & EMERY LLP, 340 Madison Avenue, New York, NY 10173, and Eliot T. Burriss, MCDERMOTT WILL & EMERY LLP, 2501 North Harwood Street Suite 1900, Dallas, Texas 75201


Andrew Borrok, J.

The following e-filed documents, listed by NYSCEF document number (Motion 006) 66, 67, 68, 69, 70, 71, 72, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 258, 264, 271, 278, 279, 280, 282, 283, 284 were read on this motion to/for DISMISS
The following e-filed documents, listed by NYSCEF document number (Motion 007) 73, 74, 75, 76, 77, 78, 79, 153, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 259, 265, 272 were read on this motion to/for DISMISS
The following e-filed documents, listed by NYSCEF document number (Motion 008) 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 262, 263, 273, 274, 275, 276, 277 were read on this motion to/for DISMISS
The following e-filed documents, listed by NYSCEF document number (Motion 009) 111, 112, 113, 188, 189, 190, 191, 192, 193, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218, 219, 220, 221, 222, 260, 266, 270 were read on this motion to/for DISMISS
The following e-filed documents, listed by NYSCEF document number (Motion 010) [*2]114, 115, 116, 223, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236, 237, 238, 239, 240, 241, 242, 243, 244, 245, 246, 247, 248, 249, 250, 251, 252, 253, 254, 255, 256, 257, 261, 267, 269 were read on this motion to/for DISMISS
Upon the foregoing documents and for the reasons set forth on the record (05/07/2020 and 05/11/20), (i) nominal defendant Renren, Inc.'s (Renren) motion (Mtn. Seq. No. 006) to dismiss pursuant to CPLR 3211(a)(1), (a)(2), (a)(3), (a)(7) and (a)(8) is denied, (ii) David Chao and DCM III, L.P., DCM III-A, L.P., DCM Affiliates Fund III, L.P., and DCM Investment Management III, LLC's (collectively, the DCM Defendants) motion (Mtn. Seq. No. 007) to dismiss pursuant to CPLR 3211(a)(1), (a)(3) and (a)(8), as well as the Fourteenth Amendment of the U.S. Constitution, is denied, (iii) Duff & Phelps, LLC's (Duff & Phelps) motion (Mtn. Seq. No. 008) to dismiss pursuant to CPLR 3211(a)(3) and (a)(7) is denied, (iv) Joseph Chen's motion (Mtn. Seq. No. 009) to dismiss pursuant to CPLR 3211 and the Fourteenth Amendment is denied, and (v) Oak Pacific Investments' (OPI) motion (Mtn. Seq. No. 010) to dismiss pursuant to CPLR § 3211 and the Fourteenth Amendment is denied.
I. Background
This is a shareholder derivative action brought on behalf of Renren, a Cayman Islands company with its principal place of business in China, about an alleged complex scheme hatched by Renren's Chief Executive Officer and Chairman of the Board of Directors (the Board), Joseph Chen, and certain other directors and controlling stockholders of Renren to defraud Renren and its minority stockholders out of over $500 million of the true value of their investment by structuring a transaction that effectively forced them to accept an undervalued cash dividend payment unless they qualified as an Eligible Shareholder (hereinafter defined), which almost none of them did. In a nutshell, the plaintiffs allege that Mr. Chen went out and raised a lot of money on the New York Stock Exchange (NYSE) to capitalize on Facebook being banned in China, promised not to make investments that would make his company qualify as an investment company under the Investment Company Act of 1940 (the Investment Company Act), broke the promise, and then when the investments appreciated, tried to go private by making an "offensive and ludicrous" offer so as to "enrich" himself by allocating the benefits of the appreciated assets to himself and certain other controlling shareholders of Renren, including Mr. Chao (Amend. Compl., ¶ 7). That offer was rebuked. The plaintiffs further allege that Mr. Chen, undeterred, and rather than up his offer, buy out the minority stockholders directly, purchase Renren's portfolio outright, sell the assets to a disinterested third party in an arm's length transaction, or otherwise do a stock spin-off so that all of the shareholders could share equally, and with the assistance of Mr. Chao and certain other controlling shareholders of Renren, structured a transaction through New York where they could loot the company based on a cooked "true value and fairness" opinion from Duff and Phelps with so many caveats that no reasonable Board member should have relied on it, which was approved by an interested Special Committee (hereinafter defined) and ultimately by the Board, which they controlled in any event (id., ¶¶ 8-10).
Specifically, the plaintiffs allege that the tainted transaction involved Renren (i) spinning off its wholly owned subsidiary, OPI (the Separation), which held Renren's investments in both private and public companies and investment funds, and distributed the shares of the subsidiary [*3]to Eligible Shareholders through a private offering (the Private Placement), and (ii) allegedly paid a substantially diminished cash dividend to non-participating shareholders (the Cash Dividend, and together with the Separation and the Private Placement, the Transaction) in a transaction approved by an allegedly interested Special Committee and deliberately structured through New York pursuant to a Deposit Agreement (hereinafter defined). According to the plaintiffs, the "going private" aspect of the transaction was deliberately designed to force out minority shareholders as the spun-off OPI would now be a private company whereby their interests would be much more illiquid and less desirable given Mr. Chen and Mr. Chao's control of the spun-off OPI, which was only enhanced by the share incentives they allocated to themselves. 
To wit, the plaintiffs allege claims against (1) Mr. Chen, who is an American citizen with a California driver's license and who held himself out to the world on his LinkedIn page (discussed infra) as being located in Phoenix, Arizona, having received three higher education degrees in the United States and serving on boards located in California, where he has been associated with, and actively involved in, the graduate school community since 1999, but who now allegedly lives and works in China; (2) David Chao, a former Board member, who lives in California (Messrs. Chao and Chen, together, the Director Defendants); (3) investment funds affiliated with Mr. Chao, i.e., the DCM Defendants, also located in California; (4) OPI, a Cayman Islands company based in China; and (5) Duff & Phelps which, through professionals based in China and Chicago, acted as financial advisor to a special committee (the Special Committee) of the Board in connection with the Transaction.
Pursuant to a Stipulation and Order Regarding Bifurcated Briefing (the Stipulation) dated May 1, 2019, the parties stipulated that briefing on the defendants' motions to dismiss would initially address the threshold issues of whether: (i) service of process upon the individual defendants was sufficient, (ii) the court has personal jurisdiction over certain defendants, and (iii) the plaintiffs have standing under Cayman law to bring suit on behalf of the Company, before addressing any other issues, if necessary (NYSCEF Doc. No. 56). Accordingly, the court will only address these issues here.
II. The Relevant Facts and Circumstances
Renren was a relatively small social media platform used primarily by college students in China known as Xiaonei or "on campus" in Mandarin (Amend. Compl., ¶¶ 50, 52). In 2006, Mr. Chen formed OPI for the purpose of acquiring Xiaonei (id., ¶ 50). Since its founding, Mr. Chen has served as OPI's Chairman, CEO, and largest shareholder by vote (id.). Mr. Chao was an early investor in OPI through his venture capital firm, DCM Ventures, and served as the company's director from March 2006 until late 2018 (id.). In April 2008, non-party Softbank, through its subsidiary SB Pan Pacific Corporation, invested $100 million in Xiaonei (id.). 
Mr. Chen's acquisition of Xiaonei coincided with the beginning of an era of extraordinary growth for online social media platforms. By 2009, Facebook, already hugely successful in the United States, had launched a Chinese-language version of its social media platform and registered the website www.facebook.cn (id., ¶ 52). Later that year, however, the Chinese government blocked Facebook from operating on the Chinese internet (id.). 
In August 2009, seizing on the Chinese government's ban of Facebook, Mr. Chen rebranded his company as the "Facebook of China" (id.). That is how Xiaonei became Renren or "everyone" in Mandarin (id.). The company's ambitions to become China's Facebook were readily apparent. A visitor to Renren in 2009 would have seen a "pixel-to-pixel" clone of Facebook, with the identical color scheme and format (id.). Mr. Chen's rebranding efforts and auspicious timing quickly bore fruit. In December 2008, the website had 33 million users (id., ¶ 53). By December 2010, Renren's user base had increased to 100 million (id.). And by March 31, 2011, Renren reportedly had more than 117 million active users (id.). In less than three years, Renren had gone from a small website for college students to a Chinese social media giant. 
Renren's apparent success attracted interest from Western investors. Renren decided to tap into the American capital markets by taking the company public. In April 2011, Renren filed its initial Form F-1 and F-6 Registration Statements with the Securities Exchange Commission (the SEC) to list its shares on the New York Stock Exchange (the NYSE) as American Depositary Shares (ADS) (id., ¶ 54). Each ADS represents 15 underlying Class A shares of Renren stock (id., ¶ 24). The SEC declared the Registration Statements effective on May 4, 2011 (id., ¶ 54). The next day, Renren filed its Rule 424 (b)(4) prospectus under the Securities Act of 1933 (id.). 
Pursuant to Section 19 of the Underwriting Agreement (the Underwriting Agreement), dated May _, 2011, by and among Renren, Mr. Chen, the selling shareholders named in Schedule II, James Jian Liu, Morgan Stanley & Co. International plc, Deutsche Bank Securities Inc., and Credit Suisse Securities (USA) LLC, the selling shareholders (of which Mr. Chen was one) each agreed to submit to the jurisdiction of the federal and state courts in New York:
19. Submission to Jurisdiction; Appointment of Agent for Service. Each Seller hereby irrevocably submits to the non-exclusive jurisdiction of the U.S. federal and state courts in the Borough of Manhattan in The City of New York (each, a "New York Court") in any suit or proceeding arising out of or relating to this Agreement, the Deposit Agreement, the Time of Sale Prospectus, the Prospectus, the Registration Statement, the ADS Registration Statement, the offering of the Offered ADSs or any transactions contemplated hereby. Each Seller irrevocably and unconditionally waives any objection to the laying of venue of any suit or proceeding arising out of or relating to this Agreement, the Deposit Agreement, the Time of Sale Prospectus, the Prospectus, the Registration Statement, the ADS Registration Statement, the offering of the Offered ADSs or any transactions contemplated hereby in the New York Courts, and irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such suit or proceeding in any such court has been brought in an inconvenient forum. Each Seller irrevocably appoints Law Debenture Corporate Services Inc., as its authorized agent (the "Authorized Agent") in the Borough of Manhattan in The City of New York upon which process may be served in any such suit or proceeding, and agrees that service of process in any manner permitted by applicable law upon such agent shall be deemed in every respect effective service of process in any manner permitted by applicable law upon the Company and the Selling Shareholders, as the case may be, in any such suit or proceeding. Each Seller and the Selling Shareholders further agrees to [*4]take any and all action as may be necessary to maintain such designation and appointment of such agent in full force and effect for a period of seven years from the date of this Agreement. 
(NYSCEF Doc. No. 200, § 19 and Schedule II). For the avoidance of doubt, pursuant to Schedule IV-1 of the Underwriting Agreement, David K. Chao is listed among the "Locked-Up Persons."
Pursuant to Section 7.6 of the Deposit Agreement (the Deposit Agreement), dated as of May 4, 2011, by and among Renren, Citibank, NA, as depositary, and the holders and beneficial owners of Renren American Depositary Shares issued thereunder, the parties agreed that New York law would govern the Deposit Agreement, that the law of the Cayman Islands would govern the rights of the holders of the ADS, and that Renren submitted to jurisdiction in federal or state courts located in the City of New York:

Section 7.6 Governing Law and Jurisdiction. The Deposit Agreement and the ADRs shall be interpreted in accordance with, and all rights hereunder and thereunder and provisions hereof and thereof shall be governed by, the laws of the State of New York applicable to contracts made and to be wholly performed in that State. Notwithstanding anything contained in the Deposit Agreement, any ADR or any present or future provisions of the laws of the State of New York, the rights of holders of Shares and of any other Deposited Securities and the obligations and duties of the Company in respect of the holders of Shares and other Deposited Securities, as such, shall be governed by the laws of the Cayman Islands (or, if applicable, such other laws as may govern the Deposited Securities). Except as set forth in the following paragraph of this Section 7.6, the Company and the Depositary agree that the federal or state courts in the City of New York shall have jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute between them that may arise out of or in connection with the Deposit Agreement and, for such purposes, each irrevocably submits to the non-exclusive jurisdiction of such courts (NYSCEF Doc. 99, §7.6)
Renren's Initial Public Offering (IPO) was a huge success; it raised over $777 million, giving it a market capitalization of nearly $8 billion (Amend. Compl., ¶¶ 2, 55). Taken together with other investments, including an exercise of series D warrants by a preferred stockholder, Renren's balance sheets reflected nearly $985 million in cash, cash equivalents, and term deposits as of December 31, 2011 (id., ¶ 55).
However, Renren's historic transcendence was followed by its precipitous decline within just a few years after its IPO. Renren's reported number of unique user logins dropped from approximately 56 million in December 2012 to approximately 45 million in December 2013 (id., ¶ 56). It reported operating losses of $5.4 million in 2011, $48 million in 2012, $99.4 million in 2013, and $159.4 million in 2014 (id.). Its gross profit margins fell from 77.6% in 2011 to [*5]67.8% in 2012, 63.3% in 2013, and 42.2% in 2014 (id.). As one commentator observed in a 2014 Bloomberg article recounting Renren's sharp decline in users and revenue, the social media platform that was once referred to as the Facebook of China was now more like the MySpace of China, a reference to the company that was the largest social media platform in the world in 2008, but lost ground to Facebook and, within just a few years, fell into relative obscurity (id., ¶ 57). 
As Renren's viability as a social media company grew increasingly dubious, Mr. Chen, armed with a stockpile of cash from the IPO, and with the assistance of Mr. Chao, the DCM Defendants, and Softbank, began looking for other ways to make Renren profitable.
Renren reported to the SEC in its Form 20-k for the year ending December 31, 2015 that it used only $3.2 million of the IPO proceeds for operating activities in 2011, $11.1 million in 2012, and $92.2 million in 2013 (id., ¶ 59). In other words, Renren was investing only a small fraction of the funds that it had raised from the IPO in its core social media business. The plaintiffs allege that Renren was not authorized to use its IPO proceeds to invest in other companies (id., ¶¶ 47, 205, 206). Starting in 2011, however, Renren began making significant investments in other start-up ventures and hedge funds using the proceeds from the IPO. By the end of 2015, Renren had invested $240 million in stock repurchases and made sizeable investments and acquisitions (id.). In total, Renren made over $244.7 million in long-term investments in 2014 and an additional $538.1 million in long-term investments in 2015 (id., ¶ 61; NYSCEF Doc. No. 88 at 92). 
Renren's investments using IPO proceeds included: (i) $79.8 million for the acquisition of 56.com; (ii) a $26.6 million long-term investment in Mapbar Technology Limited; (iii) an $80 million long-term investment in Japan Macro Opportunities Offshore Partners, LP; (iv) $32.1 million for the acquisition of a property in Shanghai; (v) a $35 million investment in shares and warrants issued by Snowball Finance Inc.; (vi) a $17.2 million equity investment in Rise Companies Corp.; (vii) a $10 million equity investment in Fundrise, L.P.; (viii) an $18.1 million investment in Eall Technology Limited; and (ix) a $12.4 million equity investment in Koolray Vision, Inc. (Amend. Compl., ¶ 60; NYSCEF Doc. No. 88 at 123-124). But Renren's largest and most significant investment of its IPO proceeds by far was its $118.4 million equity investment in Social Finance, Inc. (SoFi), a financial technology startup operating an online, peer-to-peer lending platform with an emphasis on student loans (Amend. Compl., ¶¶ 3, 60, 82; NYSCEF Doc. No. 88 at 123). As of December 31, 2015, Renren's balance sheet reflected a total of nearly $811 million in long-term investments (id. at 91). In short, Renren was no longer just a social media company.
Renren's SoFi holdings grew considerably between 2012 and 2015. In addition to making significant early investments in SoFi using the IPO proceeds, Renren continued making additional investments. In fact, by the end of 2016, Renren had invested a total of more than $242 million in SoFi, giving it a 21.06% ownership stake in the company (Amend. Compl., ¶ 74). Mr. Chen was an early investor in SoFi. He personally invested in its initial $4 million funding round in 2011 and has served on SoFi's Board of Directors since then (id., ¶ 70). The Director Defendants and DCM Ventures also hold ownerships interests in SoFi and the Director [*6]Defendants have served on SoFi's Board of Directors (id., ¶¶ 71-73). 
As a lending platform, SoFi's primary emphasis was student loan refinancing. But as it grew, it began to offer mortgages, mortgage refinancing, personal loans, and other investment products and wealth management services for investors (NYSCEF Doc. No. 121 at 45). Because it holds a New York mortgage banker license, any transaction that would result in a change of control requires the approval of the New York State Department of Financial Services (DFS) under Section 545-b of the New York Banking Law (Amend. Compl., ¶ 43). Accordingly, Renren's 21.06 % equity stake in SoFi triggered the requirement to obtain DFS approval prior to the Separation (id., ¶ 44). Significantly, pursuant to the Separation and Distribution Agreement (the Separation Agreement), dated April 27, 2018, by and between Renren and OPI, DFS approval of the transfer of SoFi shares was an express condition precedent to closing (NYSCEF Doc. No. 123, § 2.4). Section 10.4 of the Separation Agreement also provides that New York law governs the Separation Agreement itself:
10.4 Governing Law. This Agreement and, unless expressly provided therein, each Ancillary Agreement shall be governed by and construed and interpreted in accordance with the Laws of the State of New York irrespective of the choice of laws principles of the State of New York including all matters of validity, construction, effect, enforceability, performance and remedies.
(id., §10.4).
According to the Amended Complaint, Mr. Chen had access to material, nonpublic information about each of Renren's portfolio companies, but investors and analysts were largely left in the dark (Amend. Compl., ¶ 80). So when Renren's ADS were trading at below $4 between January 2015 and May 2015, the Amended Complaint alleges that the shares were significantly undervalued (id.). On June 10, 2015, Renren announced a proposal by Mr. Chen and Renren director and COO James Jian Liu to buy all outstanding shares at $4.20 per ADS (id., ¶ 81). This proposal was based on a valuation of $500 million. In the face of fierce backlash from stockholders, however, the proposal was abandoned. 
On September 30, 2016, Renren announced a new plan to spin off a subsidiary company that would hold Renren's minority stakes in privately held companies (id., ¶ 88). The new spin off company, OPI, was incorporated in the Cayman Islands on September 14, 2017 as a wholly owned subsidiary of Renren (id., ¶ 89). Mr. Chen served as a director and the CEO of OPI (id.). In turn, OPI formed a wholly-owned subsidiary holding company, Renren Lianhe Holdings (Renen Lianhe), and Renren Lianhe created a wholly-owned subsidiary holding company, Renren SF Holdings, Inc. (Renren SF) (id.). 
Although according to the Offering Circular and other public disclosures the purported justification for transferring Renren's entire value to OPI was that Renren might be deemed an "investment company" under the Investment Company Act by the SEC, the plaintiffs allege that the defendants used this as a pretext to commandeer Renren's most valuable assets by placing them in a privately held company under Mr. Chen's control (id., ¶ 167). The plaintiffs allege that even if Renren were required to dispose of its SoFi shares and other holdings to avoid being [*7]deemed an investment company, there was no reason that it had to dispose of the assets in the way that they did — i.e., to a private, off-shore company for minimal consideration that was principally owned by its controlling shareholders (id., ¶¶ 152-153). In other words, according to the plaintiffs, if this was legitimately about avoiding becoming subject to the Investment Company Act, an outright sale to a disinterested third party or a simple garden variety stock spin-off so that all of the shareholders, including the minority shareholders with no cash dividend, would have achieved the goal without depriving Renren and its shareholders of the appreciation over book value of Renren's investments. Put another way, this is a sham, plain and simple. Having had their offer to take Renren private for a song (i.e., $500 million) rejected, the Controlling Shareholders used the guise of avoiding designation as an investment company under the Investment Company Act to structure a transaction in which they could achieve in substance the same result at the same price.
Renren transferred all of its investments other than its stakes in SoFi and a company known as ZenZone to Renren Lianhe, and transferred its interests in SoFi to Renren SF after receiving approval from DFS (id., ¶¶ 90, 91). In total, Renren transferred its interests in 44 portfolio companies and 6 investment funds with a total book value of $560 million to OPI, either directly or through its subsidiaries (id., ¶ 91). In consideration for the transfer of its investments to OPI and its subsidiaries, Renren received $25 million in cash and OPI executed a $90 million promissory note (the Promissory Note) in favor of Renren (id., ¶¶ 17, 130). The $25 million payment came from Renren Lianhe via a $60 million loan from SoftBank (the Softbank Loan) (id., ¶ 191). And because the Promissory Note was subordinated to the SoftBank Loan, any proceeds that Renren Lianhe received from the sale of its SoFi shares would be used to repay the SoftBank Loan prior to any repayment of the Promissory Note (id.).
Then, the Controlling Stockholders initiated a plan to transfer ownership of OPI through a Private Placement. Pursuant to the Separation Agreement, Renren stockholders were given what the plaintiffs describe as a Hobson's choice to accept a cash dividend based on the "value" of OPI, which was set at $500 million (i.e., the very value that Mr. Chen had originally offered and which the minority shareholders had rejected) or receive shares of OPI if they qualified as both "accredited investors" and "qualified purchasers" — i.e., investors who had a net worth of at least $1,000,000 (excluding their primary residences) and at least $5,000,000 in investments (id., ¶ 11). 
On December 5, 2016, Renren announced the appointment of two new "independent" directors: Stephen Tappin and Tianruo Pu (id., ¶ 135). On December 22, 2016, Renren formed a Special Committee to evaluate the proposed Transaction. The Special Committee consisted of Mr. Tappin, Mr. Pu, and Renren's former Chief Financial Officer, Hui Hang (id.). Although the Special Committee was tasked with evaluating the proposal, the Separation Agreement ultimately required approval from Renren's full Board of Directors (id., ¶ 152, 210). In the December 22, 2016 press release announcing the formation of the Special Committee, Renren stated that "[t]he preliminary non-binding proposal would value SpinCo [i.e., OPI] at US$500 million, net of debt" (id., ¶ 42). Again, remarkably, this is the same valuation of Mr. Chen's prior unsuccessful bid to take Renren private.
The Special Committee retained Duff & Phelps to provide a valuation analysis and fairness opinion (id., ¶ 106). Duff & Phelps estimated the value of the investments transferred to OPI and its subsidiaries to be between $676 million and $775 million (id., ¶ 107). This estimate consisted of (i) the SoFi investments, valued at between $269 million to $328 million, (ii) 43 other portfolio companies and 6 investment funds, valued at between $380 million and $412 million, and (iii) ZenZone, valued at between $27 million and $35 million (id.). Based on the determination of the Special Committee and the analysis and valuation of Duff & Phelps, the cash dividends were set based on an OPI valuation of $500 million. However, the plaintiffs allege that this value was artificially deflated. 
In support of their position, the plaintiffs allege, among other things, that in April 2017, Renren sold 14.1% of its SoFi position for $93.2 million, or approximately $16.30 per share (id., ¶ 108). At that share price, Renren's remaining stake in SoFi would have been worth $566 million (id.). And in March 2017, SoFi completed a $500 million financing round at $17.18 per share, implying a value of $596.6 million for Renren's remaining stake (id.).
According to the plaintiffs, it was not just the stake in SoFi that was undervalued; it was other portfolio companies as well. For example, the value for a company called Snowball was listed at a mere $24.1 million, but based on the $100 million investment in Snowball by Ant Financial Services, an Alibaba affiliate, that valued Snowball at between $400 million and $500 million (id., ¶ 124), Renren's stake was worth between $80 million and $100 million (id.). Other notable examples include:
• A January 2017 round of financing for LendingHome indicated that OPI's stake in the company is worth more than $75 million, and LendingHome's most recent financing round in March 2018 indicates a value of over $110 million (compared to the book value of $65.8 million used by Duff and Phelps);
• A September 2017 merger involving GoGo Tech Holdings Limited . . . and a Chinese logistics company, which valued the combined company at over $1 billion, indicates that OPI's 10.48% stake is worth far more than the book value of $11.13 million used by Duff & Phelps;
• An equity valuation disclosed in June 2017 indicates that OPI's stake in Rise Companies Corp. is worth more than $46 million (compared to the book value of $12.3 million used by Duff & Phelps);
• A March 2017 financing round for Omni Prime, Inc. indicates that OPI's stake in the company is worth more than $40 million (compared to the book value of approximately $27.6 million used by Duff & Phelps);
• An October 2017 financing round for Aspiration Partners indicates that OPI's stake in the company is approximately $29 million (compared to the book value of $7 million used by Duff & Phelps);
• A January 2017 financing round for Shiftgig indicates that OPI's stake in the company is worth over $13.5 million (compared to the book value of $9 million used by Duff & Phelps);
• An August 2017 financing for StoreDot Ltd. indicates that OPI's stake in the company is worth more than $30 million (compared to the book value of $10 million used by Duff & Phelps); and
• A February 2018 acquisition transaction involving 268V Limited indicates that OPI's stake in the company is worth approximately $30 million (compared to the book value of $12.2 million used by Duff & Phelps (id., ¶ 125).
Thus, according to the plaintiffs, "[a]vailable market data indicates that those investments were worth nearly $350 million (and possibly more given additional growth during the passage of time) as of April 2018, double the book value of those same investments according to the Offering Circular" (id.).
Perhaps no example better illustrates the point than Renren's holdings in Loadstar Capital K.K. (Loadstar), a publicly traded Japanese company with a market capitalization of $210 million (23 billion) (id., ¶ 125). The plaintiffs allege that at the time of the Separation, Renren's 36.56% stake in Loadstar was worth approximately $80 million (id.). Incredibly, Duff & Phelps assigned a book value for Renren's stake in Loadstar of just $14.5 million with no explanation as to why Renren's investment in a publicly traded company was subject to any valuation discounts (id.). According to the plaintiffs, the value of this subset of investments for which market data is available was at least $509 million, compared to the book value of $380 million to $412 million used by Duff & Phelps in its "valuation" (id., ¶ 126). 
With respect to the value of Renren's stake in SoFi, the plaintiffs assert that although the OPI valuation used market-price data, which indicated a valuation of approximately $600 million, as a starting point for its analysis, Duff & Phelps inexplicably "departed from basic economic theory and ignored the market price that willing buyers had paid in determining that Renren's SoFi stake was worth far less" (id., ¶ 112). Critically, the plaintiffs allege that the valuation provided by Duff & Phelps, adopted by the Special Committee, and approved by the Mr. Chen-controlled Board, applied purely conceptual discounts only applicable under hypothetical circumstances that were not present here (id., ¶¶ 112-113). 
For example, the Special Committee, at Duff & Phelps' suggestion, applied a 40%-50% discount to Renren's stake in SoFi because, as explained in the Offering Circular, "there is typically a discount" in "purchases and sales of large blocks in private companies and secondary sale transactions for private companies" (id., ¶ 112). According to the plaintiffs, such discounts were inappropriate because there was ample market data on the marketability of SoFi shares based on SoFi's March 2017 financing round and Renren's sale of SoFi shares in April 2017, and by applying the discount that they applied, Duff & Phelps essentially double-counted any potential marketability or liquidity discounts applicable to Renren's SoFi holdings (id., ¶ 113). Overall, the plaintiffs allege that the actual value of the assets transferred to OPI and its subsidiaries was at least $967 million to $1.007 billion (id., ¶ 122). In other words, according the Amended Complaint, the valuation used as the basis to determine the amount of the cash dividend was fundamentally flawed. 
In addition, the plaintiffs allege that the Special Committee and Duff & Phelps artificially deflated the valuation of OPI by basing it on a hypothetical net asset value of OPI after the Separation (id., ¶ 129). Specifically, they deducted the $90 million face value of the Promissory Note from OPI's gross principal assets (id., ¶ 130). But because the Promissory Note was from a [*8]related party, had a lengthy maturity term, and posed collectability risks, the plaintiffs assert that its face value was significantly less than $90 million (id., ¶ 132). And, pursuant to Section 3.7 (d) (ii) of the Separation Agreement, the Promissory Note was subordinated to nearly $120 million in other debts owed to OPI, whereas OPI was funded with only $35 million in cash, and although the Promissory Note was secured by SoFi shares, that security interest was junior to the nearly $120 million in other debts, which were also secured by the SoFi Shares (id.). In addition, they allegedly deducted between $5 million and $9 million in what they deemed improper "overhead expenses," which did not benefit Renren or serve as consideration for the transfer of assets to OPI (id., ¶ 130). In other words, according to the Amended Complaint, Duff & Phelps's valuation of OPI was artificially reduced not only by the improperly taken discounts but also improper expenses, which further reduced the valuation of OPI by approximately an additional 15% (id.). 
The plaintiffs further argue that there was no reasonable basis for the Special Committee to adopt the Duff & Phelps' analysis. According to the plaintiffs, there were at least two red flags that should have given the Special Committee concern: (1) the analysis conveniently justified a valuation of $500 million, which is exactly the amount that Mr. Chen had previously offered in his bid to take Renren private, and (2) given all of the qualifications set forth in the opinion, they could not have reasonably relied on it, particularly because Duff & Phelps' analysis was only as good as the information provided by Mr. Chen and other members of Renren management as Duff & Phelps did not review any of Renren's Form-F20 annual reports and financial statements for 2015 or earlier years (id., ¶ 164; see May 7, 2020 Tr. at 88:22-89:1).
Furthermore, according to the plaintiffs — highlighting the true essence of the scheme — because OPI was to continue as a private company, in order to receive shares in OPI, Renren's shareholders would have to meet a three-part "Eligible Shareholders Test." To be an "Eligible Shareholder" (hereinafter, an Eligible Shareholder), a Renren shareholder would have to (i) be an "accredited investor" as defined under the Securities and Exchange Act of 1933, (ii) be a "qualified purchaser" as defined under the Investment Company Act of 1940, and (iii) live outside of Japan or any other jurisdiction where the offer would be prohibited (Amend. Compl., ¶ 102). The practical result of these restrictions was an effective lockout of the minority shareholders from the value of the assets of OPI in that very few Renren stockholders were Eligible Shareholders who could receive OPI shares and were relegated to accepting the Cash Dividend, which the plaintiffs allege was highly undervalued (id.). In addition, and as discussed above, because OPI was to become a private, offshore company, even those Renren stockholders who would be eligible would be trading their liquid shares of Renren for illiquid shares of OPI, where there would be little transparency, and they would have no power to change the composition of the board of directors, particularly given the enhanced ownership of Mr. Chen and Mr. Chao pursuant to the incentives they allocated to themselves (id., ¶ 11). As provided for in the Separation Agreement, the shares would be subject to significant price dilution as OPI planned to issue more than 106 million options and 6 million restricted shares new shares following the Separation (id.).
The Transaction closed and the Separation was completed on June 21, 2018 (id., ¶ 19). As part of the Transaction, the DCM Defendants received a right to receive special distributions [*9]of SoFi shares in cash or in kind, including the right to request an in-kind distribution of 1,283,710 SoFi shares from OPI, as well as an additional distribution once the SoftBank Loan was repaid by OPI (id., ¶¶ 186-87). Mr. Chao personally received additional restricted OPI shares and options through a Share Incentive Program, which he voted to approve (id., ¶ 189). After the Separation, Renren was left with its core social media business and a series of used car dealerships, both of which were losing money (id., ¶ 104). And, on July 19, 2018, the plaintiffs filed this lawsuit, seeking to restore to Renren the value that they allege was stripped away in this bold, complex scheme which they allege perpetrated a fraud on the minority shareholders of Renren.
III. DISCUSSION
A party may move for judgment dismissing one or more causes of action on the ground that the pleadings fail to state a cause of action for which relief may be granted (CPLR § 3211 [a][7]). On a motion to dismiss pursuant to CPLR § 3211 (a)(7), the court must afford the pleadings a liberal construction and accept the facts alleged in the complaint as true, according the plaintiff the benefit of every favorable inference (Morone v Morone, 50 NY2d 481, 484 [1980]). The court's inquiry on a motion to dismiss is whether the facts alleged fit within any cognizable legal theory (id.). Bare legal conclusions are not accorded favorable inferences, however, and need not be accepted as true (Biondi v Beekman Hill House Apt. Corp., 257 AD2d 76, 81 [1st Dept 1999]). A party may also move to dismiss based on documentary evidence pursuant to CPLR § 3211 (a)(1). A motion to dismiss pursuant to CPLR § 3211 (a)(1) will be granted only where the documentary evidence conclusively establishes a defense to the plaintiff's claims as a matter of law (Goshen v Mutual Life Ins. Co. of New York, 98 NY2d 314, 326 [2002]).
Another ground for dismissal is the plaintiff's lack of legal capacity to sue pursuant to CPLR § 3211 (a)(3). "The issue of lack of legal capacity to sue does not implicate the jurisdiction of the court; it is merely a ground for dismissal if timely raised as a defense" (Security Pac. Natl. Bank v Evans, 31 AD3d 278, 280 [1st Dept 2006]). Any objection or defense based on documentary evidence or of lack of capacity to sue must be raised in an answer or a pre-answer motion to dismiss and failure to do so results in waiver of the objection or defense (CPLR § 3211 [e]). 
A defendant may also move to dismiss on the ground that the court lacks subject matter jurisdiction over the causes of action asserted in the complaint (CPLR § 3211 [a][2]), or that the court lacks personal jurisdiction over the defendant (CPLR § 3211 [a][8]). On a motion to dismiss pursuant to CPLR § 3211 (a)(8), the plaintiff bears the ultimate burden to establish a basis for personal jurisdiction (Nick v Schneider, 150 AD3d 1250, 1251 [2d Dept 2017]). But to survive a motion to dismiss pursuant to CPLR § 3211 (a)(8), "the plaintiff need only make a prima facie showing that the defendant is subject to the personal jurisdiction of the court" (Whitcraft v Runyon, 123 AD3d 811, 812 [2014]). 
A. General Jurisdiction
A court may exercise general jurisdiction over a defendant pursuant to CPLR § 301 on all causes of action where the defendant's ties to New York "are so 'continuous and systematic' as to [*10]render them essentially at home in the forum state" (Goodyear Dunlop Tires Operations, S.A. v Brown, 564 US 915, 919 [2011], quoting International Shoe Co. v Washington, 326 US 310, 317 [1945]). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile" (Goodyear, 654 US at 924). And for a corporation, the paradigm forums are "the place of incorporation and [its] principal place of business" (Daimler AG v Bauman, 571 US 117, 137 [2014]). Only in an "exceptional case" will a corporation be subject to general jurisdiction in any other forum (id. at 138, n 19). 
Renren is a Cayman Islands company with its principal place of business in China. The plaintiffs allege that Mr. Chao and Mr. Chen are residents of California. The DCM Defendants are Delaware limited partnerships with their principal places of business in California. OPI is a Cayman Islands company with its principal place of business in China. None of these defendants are incorporated in New York or have their principal places of business in New York. And because no exceptional case has been alleged, they are not subject to general personal jurisdiction in New York pursuant to CPLR § 301.
B. Specific Jurisdiction
A court in New York may exercise personal jurisdiction over a non-domiciliary defendant where (i) the court has long-arm jurisdiction over the defendant under CPLR § 302, and (ii) the exercise of such jurisdiction comports with due process (Williams v Beemiller, Inc., 33 NY3d 523, 528 [2019]). As the Court of Appeals has explained, "[i]f either the statutory or constitutional prerequisite is lacking, the action may not proceed" (id.). Unlike general jurisdiction, long-arm or specific jurisdiction "is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction" (Goodyear, 564 US at 919). In other words, "the suit must aris[e] out of or relat[e] to the defendant's contacts with the forum" (Bristol-Myers Squibb Co. v Superior Ct. of Cal., San Francisco County., 137 S Ct 1773, 1780 [2017] [emphasis in original] [internal quotation marks and citation omitted]).
New York's long-arm statute provides that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state" (CPLR § 302 [a][1]). This is a "single act statute," meaning that "proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted" (Kreutter v McFadden Oil Corp., 71 NY2d 460, 467 [1988]). 
The exercise of personal jurisdiction must also comport with constitutional due process (D & R Global Selections, S.L., 29 NY3d at 299). Due process requires that a defendant must have sufficient minimum contacts with New York such that the defendant should reasonably expect to be haled into court here (LaMarca v Pak-Mor Mfg. Co., 95 NY2d 210, 216 [2000], quoting World-Wide Volkswagen Corp. v Woodson, 444 US 286, 297 [1980]), and that requiring the non-domiciliary to defend the action in New York comports with "traditional notions of fair play and substantial justice" (LaMarca, 95 NY2d at 216, quoting International Shoe Co., 326 US at 316). "The 'minimum contacts' test 'has come to rest on whether a defendant's conduct and connection with the forum State are such that it should reasonably anticipate being haled into [*11]court there'" (Rushaid, 28 NY3d at 331, quoting LaMarca, 95 NY2d at 216 [internal quotation marks and citations omitted]). The inquiry is whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State" (id.). 
i. The Court Has Long-Arm Jurisdiction Over Renren
In support of its motion to dismiss, Renren argues that CPLR § 302 (a) (1) does not apply because no causes of action are asserted against Renren directly, and there is no articulable nexus between the causes of action asserted in the complaint and Renren's transaction of business in New York. Renren further argues that the exercise of personal jurisdiction over it would not comport with due process because it lacks minimum contacts with New York. Specifically, Renren argues that the IPO on the NYSE does not establish a basis for personal jurisdiction because any connection between the IPO and the claims in this action are too attenuated, and because the investments and SEC inquiries that ultimately led to the Separation occurred several years after the IPO. Renren argues that obtaining regulatory approval from DFS for the change in control of SoFi's mortgage banker's license is not a basis for personal jurisdiction because the regulatory approval was, at best, incidental to the claims in this action. And, Renren argues that the choice of law provisions in the Deposit Agreement and Separation Agreement do not confer personal jurisdiction because the negotiation and performance of the agreements occurred outside of New York and the claims do not arise from or relate to either agreement. 
In addition, Renren argues that its use of New York attorneys and bankers is an insufficient predicate for personal jurisdiction because those contacts are ministerial in nature and were merely legal and logistical requirements attendant to the IPO. Moreover, Renren argues that, although ADS holders choosing to participate in the Private Placement were directed to submit their election notices to a New York address and wire their fees to a New York bank account, and although dividend payments were to be made from an account at Citibank in New York, such contacts are insufficient because they do not establish that Renren projected itself into New York and they are unrelated to the claims asserted by the plaintiffs.
In their opposition papers, the plaintiffs argue that the court may exercise long-arm jurisdiction over Renren under CPLR § 302 because the statute applies broadly to "any non-domiciliary" that "transacts any business within the state," which necessarily includes a foreign corporation in a shareholder derivative action, and if courts could only exercise personal jurisdiction over a foreign corporation under CPLR § 301 in a derivative action, this would lead to the absurd result that derivative claims brought on behalf of foreign corporations could never be brought in New York. The plaintiffs further argue that the court has personal jurisdiction over Renren pursuant to CPLR § 302 (a)(1) because their claims relate to Renren's improper disposition of assets acquired with funds obtained in Renren's IPO on the NYSE, and the IPO was conducted in New York using New York bankers and attorneys. In addition, the plaintiffs argue that Renren projected itself into New York and invoked the benefits and protections of its laws in connection with the IPO, the Separation, the Private Placement, and the Cash Dividend. 
Specifically, and as discussed supra, the plaintiffs argue that (i) the Separation Agreement expressly required Renren to obtain approval from DFS prior to transferring its SoFi [*12]holdings, and such approval was not incidental but a condition precedent to the Separation, (ii) the Separation Agreement required Renren to send notices and payments to New York, including for the Cash Dividend, (iii) both the Offering Circular for the Private Placement and the Separation Agreement required performance in New York by Renren's ADS holders, making its attorneys' New York office a clearinghouse for election notices, and (iv) both the Deposit Agreement and the Separation Agreement contain New York choice of law provisions.
Here, the plaintiffs have met their burden in making a prima facie showing that Renren transacted business in New York for the purposes of CPLR § 302 (a)(1) in connection with (1) the IPO on the NYSE, (2) the Separation, (3) the Private Placement, and (4) the Cash Dividend, and that such activities have an articulable nexus with the claims asserted in the Amended Complaint.
First, the IPO on the NYSE, while in and of itself may not be sufficient to satisfy the long arm statute, taken together with the other factual allegations concerning Renren's New York contacts, is a sufficient basis for personal jurisdiction over Renren. In addition, the plaintiffs have made a prima facie showing that the Separation has an articulable nexus to New York and that the claims asserted in the Amended Complaint, i.e., that Renren turned itself into a de facto venture capital fund using the IPO proceeds and then siphoned off its investments to OPI (which are the initials for Oak Pacific Investments and, perhaps prophetically is IPO spelled backwards), directly relate to the Separation. First, the Separation could not have been completed without DFS approval (Amend. Compl., ¶ 40). Because SoFi holds a banking license in New York and Renren held a 21.06 % equity stake in SoFi, DFS approval was required pursuant to New York Banking Law § 594-b before the Separation could occur (id., ¶ 43). And, significantly, the Offering Circular states that DFS approval was a condition precedent to the Separation (id., ¶ 44). The regulatory approval in this case was not merely incidental to the claims asserted in the complaint but was an integral step in the process of completing the Transaction that gives rise to the claims. 
And, as alleged in the Amended Complaint and as demonstrated by the documentary evidence, there are several other connections with New York with respect to the Transaction. Indeed, one of the relevant factors to consider in determining whether a non-domiciliary defendant transacted business within New York is "whether the contract requires [parties] to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state" (Agency Rent A Car Sys., Inc. v Grand Rent A Car Corp., 98 F 3d 25, 29 [2d Cir 1996]). Here, the governing agreements relating to the IPO and the Transaction required notices and payments to be sent into New York. Notably, the Separation Agreement, which was governed by New York law, required Renren to send an "instruction letter" to Citibank in New York (id., ¶ 41, 45; NYSCEF Doc. No. 123, § 3.3 [a]). The Offering Circular pursuant to which Renren shareholders were given the option to take the Cash Dividend or receive OPI shares required that the election forms be sent to Renren's counsel's offices in New York (id., ¶ 42). The Deposit Agreement, which governed the distribution of the Cash Dividend and was therefore an integral part of the Transaction, was governed by New York law. And, the parties themselves chose New York pursuant to the forum selection clauses (id., ¶ 45). 
Moreover, the Court of Appeals has held that, in the context of corresponding bank accounts, the intentional use of a New York account in connection with a transaction supports personal jurisdiction pursuant to CPLR § 302 (a)(1) (Rushaid, 28 NY3d at 325-328 [finding personal jurisdiction where defendant used New York bank account to receive bribe money and conduct a money laundering scheme]). As the Court of Appeals explained in Licci v Lebanese Can. Bank, SAL:
[C]omplaints alleging a foreign bank's repeated use of a correspondent account in New York on behalf of a client—in effect, a "course of dealing" (see Indosuez Intl. Fin. v National Reserve Bank, 98 NY2d 238, 247 [2002])—show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States (20 NY3d 327, 339 [2012]).
Here, again, those opting to receive the Cash Dividend were directed to pay the required per-share depositary fee to an account at Citibank in New York (Amend. Compl., ¶ 43), and pursuant to Section 2.7 of the Deposit Agreement, Cash Dividends were to be paid from a Citibank account in New York (id., ¶ 46; NYSCEF Doc. No. 129, § 2.7). In addition, pursuant to Section 7.5 of the Deposit Agreement, all notices were to be sent to Citibank in New York (NYSCEF Doc. No. 129, § 7.5). The Underwriting Agreement executed by Renren in connection with the IPO was also governed by New York law and contained a New York forum selection clause (id., ¶ 47). Pursuant to the Underwriting Agreement, a number of the underwriters were based in New York and the IPO proceeds were paid to Renren through its account in New York City (id.).
As discussed above, the plaintiffs allege that Renren was required not to use the proceeds of the IPO in such a manner as to bring Renren within the purview of the Investment Company Act pursuant to the Underwriting Agreement (id.). In other words, in the Underwriting Agreement, Renren agreed not to use the IPO proceeds to effectively become a venture capital fund, and that is exactly what the plaintiffs allege occurred. And, significantly, to the extent that Renren had to dispose of certain of its investment holdings, nothing required it to dispose of its holdings in the way that it did — i.e., by structuring a transaction that required non-Eligible Shareholders to take a cash distribution through the New York banking system. The Transaction could have been a stock spin-off without a cash distribution or an outright sale to a disinterested third party. Simply put, it is of no moment that Renren needed to avoid registration as an investment company under the Investment Company Act as it relates to the issue of jurisdiction as the same could have been achieved without purposefully availing itself of the protections and privileges of New York.
It may very well be true that, as Renren argues, the mere listing of Renren's ADS on the NYSE and the administrative activities attendant to that task, without more, would not be a sufficient basis for personal jurisdiction. But, as the Second Circuit has observed, "it is not that activities necessary to maintain a stock exchange listing do not count, but rather that, without more, they are insufficient to confer jurisdiction" (Wiwa v Royal Dutch Petroleum Co., 226 F 3d 88, 97 [2d Cir 2000], citing Pomeroy v Hocking Valley Ry. Co., 218 NY 530, 536 [1916] ["The payment, too, of dividends and the transfer of stock while perhaps not sufficient of themselves to [*13]constitute the transaction of business . . . , doubtless are of some importance in connection with other facts."]). Here, of course, as set forth above, there is more. Nearly every aspect of the IPO and the Transaction are connected to New York. And, Renren's New York-based contacts were not merely incidental to listing its ADS on the NYSE; they relate to a deliberate decision to structure the disposition of assets from Renren pursuant to the Transaction, which necessarily involved New York. Because Renren's activities go beyond the IPO and the mere ancillary steps related thereto, its conduct is sufficient to confer personal jurisdiction over it in New York (Wiwa, 226 F 3d at 97-98).
To the extent that Renren relies on Holzman v Guoqiang Xin (No. 12-CV-8405 AJN, 2015 WL 5544357, *2 [SD NY Sept. 18, 2015]) for the proposition that the court does not have personal jurisdiction merely by virtue of the IPO on the NYSE, Renren's reliance is misplaced. In Holzman, the plaintiff was a shareholder of the nominal defendant SinoTech Energy Limited (SinoTech), a Cayman Islands company with its principal place of business in China (id. at *1). The plaintiff brought a putative shareholder derivative action against SinoTech's controlling shareholder and Chairman of its Board of Directors, Qingzeng Liu, as well as other directors and executives, alleging that the defendants misappropriated $40 million in proceeds from SinoTech's IPO of American Depositary Shares on the NYSE (id. at *2). Mr. Liu moved to dismiss the complaint for lack of personal jurisdiction (id. at *3). 
The plaintiff's asserted basis for personal jurisdiction was that Mr. Liu transacted business within the state pursuant to CPLR § 302 (a)(1) when he directed and controlled SinoTech's IPO (id. at *5). First, the plaintiff argued that the asserted claims arose out Mr. Liu's transaction of business in New York because Mr. Liu stole funds out of the proceeds from the IPO (id.). The court commented that the plaintiff's pleadings were insufficient to demonstrate the nexus between Mr. Liu's alleged transaction of business—namely, the IPO on the NYSE—and the alleged misappropriation of funds, which happened six months after IPO (id. at * 6). The court observed: "[n]owhere does [the plaintiff] claim that the $40 million transferred to Liu was taken directly from the IPO in New York. Instead, the complaint cites to SinoTech's own press release, which explains that the funds were taken from the Chinese bank account of the company's Chinese corporate entity" (id.). As the court explained: "[p]erhaps some, or even all, of that money stemmed from the New York IPO. But the fact that Liu's New York contacts may have been 'a link in the chain of causation leading to plaintiff's claims' is not, on its own, sufficient for jurisdiction under section 302 (a) (1)" (id., quoting Faherty v Fender, 572 F Supp 142, 147 [SD NY 1983]). The plaintiff's second argument was that the IPO was the first step in Mr. Liu's plan to steal the company's funds (id.). The court, however, determined that the theory of a multi-stage scheme originating with the IPO was not sufficiently alleged in the complaint to make such an allegation plausible (id.).
In any event, the court declined to resolve the jurisdiction question and denied jurisdictional discovery for that reason (see id. at *6, n 1) and ultimately dismissed the cased based on forum non conveniens (which is not a ground upon which the defendants have moved to dismiss at this time):
Given these difficulties with Holzman's personal jurisdiction arguments, the Court [*14]declines to definitively resolve the issue. Regardless of whether there is a close enough nexus between the New York IPO and Holzman's causes of action to satisfy New York's long-arm statute, any such nexus is sufficiently attenuated to call into question the appropriateness of this district as the forum for resolving Holzman's claims. For the reasons that follow, the Court concludes that the case should be dismissed on forum non conveniens grounds (id. at *11).
Inasmuch the District Court (Nathan, J.) stated that, "Holzman's second argument . . . attempts to more directly tie the claims in this case to New York" but held that Holzman failed to sufficiently allege the details of the purported scheme, and because the District Court cited the difficulties of resolving the motion on personal jurisdiction grounds as pleaded (id. at *6), the court very well may have otherwise permitted the plaintiffs to replead.
Putting aside the language in Holzman relied upon by the Defendants, here, unlike in Holzman, the Amended Complaint alleges that Renren used the IPO proceeds to make the investments that were stripped out of Renren in the Separation and transferred to OPI and its subsidiaries (Amend. Compl., ¶¶ 3, 47, 59-62, 74, 91-98). Notably, Renren stated in its 2015 Annual Report filed with the SEC that it was using the IPO proceeds to make the very investments that were ultimately divested (id., ¶ 60; NYSCEF Doc. No. 88 at 123-124). Significantly, the Amended Complaint alleges that because Renren's core social media business was losing money, the investments at issue in this case could not have been made but for the IPO (Amend. Compl., ¶¶ 4, 56-57, 173-175). In other words, the link here between the IPO on the NYSE and the causes of action asserted is not as attenuated as in Holzman as the Amended Complaint in this case draws a straight line from the IPO and the investments made from the proceeds thereof to the Transaction and the ultimate divestiture of those investments in the Separation.
Renren also relies on the recent Commercial Division decisions in Access Advantage Master, Ltd. v Alpha Prime Fund Ltd., 2020 NY Slip Op. 30932(U) (Sup Ct NY County, Apr. 9, 2020) and Poms v Dominion Diamond Corp., 2019 NY Slip Op. 31364(U) (Sup Ct NY County, May 15, 2019) to argue that the connections to New York are too tangential in this case to support jurisdiction. The argument fails. 
In Access Advantage, the defendant invested approximately $30.3 million of the plaintiff's money in Bernard L. Madoff Investment Securities LLC, a New York-based investment fund, and subsequently participated in that fund's bankruptcy proceedings in New York after it was discovered that Mr. Madoff was running a multibillion-dollar Ponzi scheme (Access Advantage, 2020 NY Slip Op., at *1). The court (Sherwood, J.) held that these New York contacts were merely links in the chain of events giving rise to the claims asserted by the plaintiff and these links were not substantially related to the claims, which arose from the defendant's suspension of redemption requests and the failure to repay the plaintiff once it received funds in a settlement (id. at *6). In other words, there was no substantial nexus between the investment of funds and the claims asserted by the plaintiff because the claims related to the defendant's failure to honor the plaintiff's redemption request, not to the underlying investment. 
Access Advantage is materially different from the case at bar. Unlike in Access Advantage, where the defendant's limited contacts with New York relating to the underlying investment were unrelated to the defendant's alleged failure to honor the plaintiff's redemption request, Renren's transaction of business in this case is directly connected to the claims asserted by the plaintiffs. And, as discussed above, the Transaction itself which is challenged here involved the purposeful availment of New York as disposing of the assets to avoid the Investment Company Act could have been structured in any number of different ways which did not necessarily require the use of New York as a forum.
Poms is equally unavailing. In Poms, the plaintiff brought a putative class action against the defendant corporation and its individual directors for negligent misrepresentation, breach of fiduciary duty, and quasi-appraisal, alleging that the defendants made incomplete and misleading filings in connection with a proposed merger and failed to follow specific proxy rules required under Canadian law (Poms, 2019 NY Slip Op. at *1-3). The plaintiff asserted that the court had personal jurisdiction over the defendants because the defendant corporation (i) was publicly traded on the NYSE, (ii) retained a law firm headquartered in New York and a Canadian proxy solicitation agent with an office in New York, (iii) and the contract allegedly governing the subject transactions contained New York choice of law and forum selection clauses (id. at *5). The court (Scarpulla, J.) held that the defendant was not "doing business" in New York merely because it was listed on the NYSE, and that the use of New York-based counsel and proxy agent was insufficient to confer jurisdiction because the claims asserted by the plaintiffs did not relate to the provision of legal advice or arise from the appointment of the proxy agent (id. at *7-9). The court further held that the defendant did not voluntarily submit to personal jurisdiction in New York by virtue of the choice of law and forum selection clauses because they expressly applied only to claims relating to debt financing, and the claims asserted by the plaintiff were not related to debt financing (id. at *6). 
In other words, the claims in Poms were wholly unrelated to the defendant's listing of shares on the NYSE and the agreements that contained the forum selection clause and the challenged conduct were not necessarily structured through New York. That is the opposite of what is alleged by the plaintiffs in this case. As discussed above, the plaintiffs allege that not only was the IPO conducted in New York, but also the forum selection clause is contained in the governing agreements that forms a basis for the very Transaction which the plaintiffs are challenging and the Transaction was deliberately structured in a manner that required the use of the New York forum. In addition, whereas in Poms there was no articulable nexus between the defendant's use of the New York-based attorneys and proxy agent, here, there is a much stronger connection as Renren's New York-based counsel is alleged to have helped structure the Transaction and served as an intermediary, including by acting as a clearinghouse for shareholder election notices, among other things described above.
And, to the extent that Renren argues that CPLR § 302 does not apply to it because no claims are asserted against it (i.e., because the claims are asserted on its behalf), the court notes that CPLR § 3211, the statute under which Renren seeks relief, similarly allows a party to move to dismiss "one or more causes of action asserted against" it, so by Renren's reasoning, because the claims are technically brought on behalf of Renren and not against it, Renren would not be [*15]able to move to dismiss under CPLR § 3211. This tortured and inconsistent interpretation of the CPLR is obviously incorrect. In addition, Renren's contention that neither CPLR § 302 nor any other statute allows for personal jurisdiction over a foreign corporation in a derivative suit ignores Business Corporation Law § 626, which expressly contemplates such actions. 
Moreover, the exercise of personal jurisdiction over Renren comports with due process. As set forth above, the plaintiffs have alleged that Renren raised $777 million through its IPO from New York's capital markets, used the proceeds from the IPO to make several investments and effectively form a de facto venture capital fund (which it was prohibited from doing pursuant to the Underwriting Agreement and the Investment Company Act), and then improperly divested those investments through the Separation, which was effectuated in New York and governed by New York law. By tapping into New York's capital markets to conduct the IPO, electing to do a transaction that necessarily required the use of New York's regulatory and banking system to effectuate the Separation, and agreeing that New York law would govern the controlling agreements, Renren purposefully availed itself of the privileges and protections of doing business in New York. Based on these contacts, Renren certainly should reasonably anticipate being haled into court here in connection with the Transaction.
In determining whether personal jurisdiction in a given case would offend traditional notions of fair play and substantial justice, courts consider: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies" (Burger King Corp. v Rudzewicz, 471 US 462, 477 [1985]). When the defendant is a foreign corporation, the court must consider the international judicial system's interest in obtaining efficient and effective relief and the shared interests of the nations in advancing substantive policies (Asahi Metal Indus. Co., Ltd. v Super Ct of Cal., Solano County, 480 US 102, 115 [1987]). As the U.S. Supreme Court has noted, "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant" (id. at 104). 
Here, Renren has not met its burden to establish that jurisdiction is unreasonable. The burden on Renren is minimal. Renren's numerous contacts with New York described above demonstrate that litigating in New York is foreseeable and would not be unduly burdensome. Renren is represented in New York by Skadden, Arps, Slate, Meagher & Flom LLP (Skadden Arps). Skadden Arps has represented Renren in the past in connection with its New York activities and, "the conveniences of modern communication and transportation ease" any burden that Renren might face in litigating in New York (Licci v Lebanese Can. Bank, SAL, 732 F 3d 161, 174 [2d Cir 2013], quoting Metro. Life Ins. Co. v Robertson-Ceco Corp., 84 F 3d 560, 574 [2d Cir 1996]). In addition, the majority of the defendants and likely witnesses are United States citizens or are entities that are incorporated in or have their principal places of business in the United States (Amend. Compl., ¶¶ 25-30). Accordingly, given the alternative forums of China or the Cayman Islands, New York is, by comparison, far less burdensome. Finally, this case implicates New York's strong "interest in maintaining and fostering its undisputed status as the [*16]preeminent commercial and financial nerve center of the Nation and the world" (Ehrlich-Bober & Co. v Univ. of Houston, 49 NY2d 574, 581 [1980]). As this case involves the listing of ADS on the NYSE, the use of the New York banking system, and a Transaction purposefully structured through New York and governed by New York law, New York undoubtedly has a strong interest in the resolution of this litigation. Accordingly, the court has personal jurisdiction over Renren pursuant to CPLR § 302 (a) (1). 
ii. The Court Has Long Arm Jurisdiction Over Mr. Chen
The critical issues are (1) whether Mr. Chen was a "primary actor" with respect to Renren's transaction of business in New York such that he is subject to personal jurisdiction pursuant to CPLR § 302 (a)(1), and (2) whether Mr. Chen was properly served with the summons and complaint. 
Where a corporation engages in purposeful activities within New York with respect to the subject transaction with the knowledge and consent of the defendant, the court has personal jurisdiction over the defendant by virtue of the corporation's activities where the defendant benefited from the transaction and exercised some degree of control over the corporation in relation to the transaction (Retail Software Servs., Inc. v Lashlee, 854 F 2d 18, 21-22 [2d Cir 1988]). A plaintiff asserting personal jurisdiction over a defendant based on the actions of his or her corporate agent need not establish a formal agency relationship (Kreutter, 71 NY2d at 467). The plaintiff "need only convince the court that [the] Company engaged in purposeful activities in this State in relation to [the] transaction for the benefit of and with the knowledge and consent of the . . . defendants and that they exercised some control over [the] Company in the matter" (id.). To satisfy the element of control, the plaintiff must allege in sufficient detail that the defendant was a primary actor in the subject transaction (Coast to Coast Energy, Inc. v Gasarch, 149 AD3d 485, 487 [1st Dept 2017]). 
Mr. Chen argues that he resides and works in China and lacks sufficient contacts with New York to support the exercise of personal jurisdiction over him. In addition, Mr. Chen argues that the Amended Complaint fails to allege any significant connections between the Transaction and New York that would justify jurisdiction over him by virtue of his role as a corporate officer and director of Renren and OPI. In addition, Mr. Chen argues that the court lacks jurisdiction over him because he was not properly served in accordance with Chinese law.
In their opposition papers, the plaintiffs argue that the court has specific jurisdiction over Mr. Chen because he was a primary actor with respect to the IPO and the Transaction, which for the reasons discussed above, constituted transacting business in New York pursuant to CPLR § 302 (1). The plaintiffs further argue that Mr. Chen is not a foreign national but a U.S. Citizen with a California driver's license who held himself out to the world as living and working in Arizona, and therefore he was properly served pursuant to CPLR § 308 (2). In addition, they argue that service was proper in accordance with a court order permitting alternative service.
Here, the plaintiffs have established grounds for personal jurisdiction over Mr. Chen pursuant to CPLR § 302 (a)(1). As discussed above, the gravamen of the Amended Complaint is that Mr. Chen together with other controlling shareholders including Mr. Chao orchestrated the [*17]Transaction to siphon-off Renren's most valuable assets for the benefit of themselves (Amend. Compl., ¶ 8). The well pled Amended Complaint sets forth in detail numerous allegations to support the inference that Mr. Chen was a primary actor: (i) Mr. Chen had previously attempted to take Renren private in June 2015 (id., ¶ 7), (ii) Mr. Chen signed the Underwriting Agreement and all of Renren's securities filings to effectuate the IPO, and then improperly funneled the IPO proceeds into various investments, including SoFi, a company in which he had invested personally and served as a director (id., ¶¶ 3-4, 47, 59-62, 70-76), (iii) as Renren's founder, CEO, and largest shareholder, the divestiture of a billion-dollar investment portfolio could not have happened without Mr. Chen's involvement (id., ¶ 3), (iv) Mr. Chen "stacked the Special Committee" with "loyalists," and the Special Committee arrived at a valuation for OPI that was precisely the same as the value that Mr. Chen had proposed in his prior unsuccessful bid to take Renren private (id., ¶¶ 105-16, 135-152), (v) Mr. Chen provided assumptions and financial information to Duff & Phelps to arrive at the pre-ordained value of OPI (id., ¶¶ 161-164), (vi) Mr. Chen received direct benefits from the Separation, including enhanced control over OPI and the investments, an increased ownership interest, and special distribution rights (id., ¶¶ 11, 104, 186, 187, 189) and (vii) Mr. Chen was the Chairman and Executive Director of OPI. Based on the foregoing allegations, the Amended Complaint sufficiently alleges that Mr. Chen was a primary actor with respect to the Transaction and is therefore subject to personal jurisdiction pursuant to CPLR § 302 (a)(1). 
To the extent that Mr. Chen argues that he is shielded from liability under the "fiduciary shield doctrine," the argument is unavailing. The fiduciary shield doctrine "provides that an individual should not be subject to jurisdiction if his dealings in the forum State were solely in a corporate capacity" (Kreutter, 71 NY2d at 467). Notably, however, the Court of Appeals has expressly rejected the application of the fiduciary shield doctrine to inoculate individuals acting on behalf of corporations from personal jurisdiction. As the Court explained in Kreutter:
Turning then to the interpretation of CPLR 302, we determine that it is neither necessary nor desirable to adopt the fiduciary shield doctrine in New York. Nothing in the statute's language or the legislative history relating to it suggests that the Legislature intended to accord any special treatment to fiduciaries acting on behalf of a corporation or to insulate them from long-arm jurisdiction for acts performed in a corporate capacity (id. at 470).
Accordingly, Mr. Chen cannot invoke the fiduciary shield doctrine to avoid the court's long-arm jurisdiction in this case. 
In addition, service on Mr. Chen was proper. The Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters (the Hague Service Convention) "is a multilateral treaty that was formulated in 1964 by the Tenth Session of the Hague Conference of Private International Law" (Volkswagenwerk AG. v Schlunk, 486 US 694, 698 [1988]). The Hague Service Convention applies in all cases where service on a foreign defendant requires the transmittal of judicial or extrajudicial documents abroad (id. at 699). As the US Supreme Court has observed, "[T]he internal law of the forum is presumed to determine whether there is occasion for service abroad," and "[w]here service on a domestic agent is valid and complete under both state law and the Due Process Clause, our inquiry ends and the [*18]Convention has no further implications" (id. at 704, 707). 
Here, the plaintiffs unsuccessfully attempted to serve Mr. Chen in Arizona, Texas, and California. Subsequently, the plaintiffs moved for leave to serve Mr. Chen by alternative service pursuant to CPLR § 308 (5). The court (Ramos, J.) issued an ex parte order, dated October 2, 2018 (NYSCEF Doc. No. 219), granting the plaintiffs' motion and authorizing alternative service on Mr. Chen. The order states, in relevant part:
ORDERED that such service upon Defendant Chen shall be made as follows:
a. By e-mail and registered mail to Christopher P. Malloy, the Skadden, Arps, Slate, Meagher & Flom LLP partner representing nominal defendant Renren, Inc. in this matter;
b. By registered mail to the registered agent of nominal defendant Renren, Inc. in this matter;
c. By registered mail to 4506 Acre Street, Union City, California, 94587, what is believed to be Defendant Chen's sister's house, addressed to Defendant Chen and in an envelope marked "personal and confidential" and not indicating on the outside thereof by return address or otherwise that the communication is from an attorney or concerns an action against Defendant Chen; and
d. By registered mail to 4573 Niland Street, Union City, California, 94587, what is believed to be Defendant Chen's parents' house, addressed to Defendant Chen, and in an envelope marked "personal and confidential" and not indicating on the outside thereof by return address or otherwise that the communication is from an attorney or concerns an action against Defendant Chen (id.).
As the First Department has explained, "while service of process by e-mail is not directly authorized by either the CPLR or the Hague Convention, it is not prohibited under either state or federal law, or the Hague Convention, given appropriate circumstances (Alfred E. Mann Living Trust v ETIRC Aviation S.a.r.l., 78 AD3d 137, 141 [1st Dept 2010]). And, importantly, "federal courts have considered whether court-ordered service of process by e-mail and fax comports with due process requirements and have concluded that it is proper as long as there has been a showing that those methods are 'reasonably calculated to apprise defendants of the pendency of the action'" (id. at 142, citing Philip Morris USA Inc. v Veles Ltd., 2007 WL 725412, *3 [SD NY Mar. 12, 2007]; Rio Props. Inc. v Rio Intl. Interlink, 284 F 3d 1007, 1017 [9th Cir 2002]). 
In addition, a court may grant an order authorizing alternative service without first requiring a party to attempt service under the Hague Service Convention (In GLG Life Tech Corp. Securities Litigation, 287 FRD 262, 266 [SD NY 2012] ["But nothing in Rule 4(f) itself or controlling case law suggests that a court must always require a litigant to first exhaust the potential for service under the Hague Convention before granting an order permitting alternative service under Rule 4 (f) (3)"]). Courts have observed that alternative service does not implicate the Hague Service Convention where no documents are transmitted abroad (see id. at 267). And, courts in New York routinely permit service on a foreign defendant through his or her U.S. counsel, and have observed that such service is not prohibited under the Hague Service Convention (RSM Production Corp. v Fridman, No. 06 CIV. 11512(DLC), 2007 WL 2295907, [*19]*3 [SD NY Aug. 10, 2007])
First, the court notes that Mr. Chen does not deny that he is a U.S. Citizen with a California driver's license. Indeed, and significantly, in support of their application to the court (Ramos, J.) for substitute service (Motion Seq. No. 001), the plaintiffs included Mr. Chen's own LinkedIn page (NYSCEF Doc. No. 13, Exhibit D) where he himself indicates that for over 25 years (i.e., from 1993 until Present), he was located in the United States and that he was currently located in Phoenix, Arizona. To wit, he indicates, among other things, that (i) he received his Bachelors of Science degree from the University of Delaware (1990-1993), (ii) his Masters of Mechanical Engineers from Massachusetts of Technology (1993-1995), (iii) his Masters of Business from Stanford University (1997-1999), (iv) he was a Board Member (2012 — Present) and Executive Director (2017 — Present) of Trucker Path located in Phoenix, Arizona, an Investor/Board Advisor of Aspiration.com (2014-Present), located in the Greater Los Angeles Area, (v) he was the Chairman/Executive Director of OPI which is described as being located in "Asia/US" and, finally, (vi) as part of his activity section of his activity page he wrote:
I gave a talk a few weeks ago at a Stanford event, this is the link to my presentation: Future Drivers for Global Fintech Drawing from our 20+ fintech investments globally
(id.).
In addition, in the investigator's affirmation submitted by the plaintiffs in support of their ex parte motion for alternative service, the investigator stated that Mr. Chen received a traffic citation in December 2017, which lists his address as 4506 Acre Street, Union City, California 94587 (NYSCEF Doc. No. 14, ¶ [4][d]). And, when a process server attempted to serve him at that address (which the investigator and the process server believe now belongs to Mr. Chen's sister) on August 14, 2018, the person who answered the door indicated that Mr. Chen was "not in" and said to try in the morning (NYSCEF Doc. No. 15). On subsequent attempts, the process server was told to try again on Thursday or Friday afternoon (id.). When the process server attempted to serve him at what was believed to be his parents' house, the person who answered the door indicated that it he was not in and that this was not his home address (id.). The process server noted: "I believe they are lying to me" (id.). But, notwithstanding how he held himself out to the world both on his LinkedIn page and per his California driver's license, to the extent that he claims to live in China, he was properly served in accordance with Judge Ramos' order. The service permitted in Judge Ramos' order did not run afoul of the Hague Service Convention and was reasonably calculated to provide Mr. Chen notice of the pendency of the action. 
In addition, because Mr. Chen was a primary actor involved in the IPO and the Transaction, which constitute the transaction of business in New York, personal jurisdiction over Mr. Chen comports with due process. As discussed above, the Amended Complaint alleges in great detail that Renren, at Mr. Chen's direction, conducted the IPO on the NYSE and improperly used the $777 million in proceeds from the IPO to make several investments, including in SoFi, and then stripped the investments out of Renren for himself and certain controlling shareholders in a transaction that necessarily required the use of New York — i.e., including the New York capital markets and legal and banking systems, requiring regulatory [*20]approval in New York, and under agreements governed by New York law. The plaintiffs allege that Mr. Chen orchestrated this scheme to perpetrate a fraud on the minority shareholders for his benefit. Based on these allegations, Mr. Chen has sufficient minimum contacts with New York for the purposes of constitutional due process. Based on his deliberate Transaction structure and his substantial reliance on New York law and institutions, Mr. Chen could reasonably anticipate being haled into court here. Finally, as discussed above, Mr. Chen expressly submitted to jurisdiction in New York in the Underwriting Agreement for any dispute arising from or relating to the Underwriting Agreement, Deposit Agreement, or IPO (NYSCEF Doc. No. 200, § 19).
Thus, personal jurisdiction over Mr. Chen does not offend traditional notions of fair play and substantial justice and Mr. Chen has failed to meet his burden in demonstrating that the exercise of personal jurisdiction over him would be unreasonable (D & R Glob. Selections, 29 NY3d at 299-300).
iii. The Court Has Long Arm Jurisdiction Over Mr. Chao and the DCM Defendants
As set forth above, a court may exercise personal jurisdiction over a defendant based on the activities of the corporate agent where the corporate agent engaged in purposeful activities within New York with respect to the subject transaction with the knowledge and consent of the defendant and where the defendant exercised some degree of control over the corporation (Kreutter, 71 NY2d at 467). 
In addition, pursuant to CPLR § 306-b, a plaintiff must serve a summons and complaint within 120 after commencement of the action. If the plaintiff fails to properly serve a defendant within the prescribed period, the action is subject to dismissal without prejudice absent a showing of good cause for an extension of time for service, or a showing that such an extension is warranted in the interest of justice (id.; Leader v Maroney, Ponzini & Spencer, 97 NY2d 95, 101 [2001]). An affidavit of service is prima facie evidence of proper service (Reem Contracting v Altschul & Altschul, 117 AD3d 583, 584 [1st Dept 2014]. Purported defects in an affidavit of service are considered mere irregularities and not jurisdictional defects (id. at 584-585). Pursuant to CPLR § 308 (2), personal service on an individual defendant may be made by (i) delivering the summons within the state to a person of suitable age and discretion at the defendant's actual place of business, (ii) within 20 days after delivery, mailing the summons to the defendant's last known residence or place of business, and (iii) within 20 days after mailing the summons, filing appropriate proof of service with the court.
Here, the plaintiffs argue that Mr. Chao the DCM Defendants are subject to personal jurisdiction by virtue of Renren's IPO and the Transaction, as well the activities undertaken in connection therewith, which involve numerous New York-based contacts. The plaintiffs further argue that the court has personal jurisdiction over Mr. Chao, individually, because he knew of, and participated in the structuring of the Transaction, exercised some degree of control over Renren based on his substantial beneficial ownership, and disproportionately benefited from the Transaction by virtue of the Share Incentive Plan and was therefore a "primary actor" involved in Renren's New York-Transaction of business for jurisdictional purposes. The plaintiffs argue that they properly served Mr. Chao with the summons and complaint by substituted service pursuant to CPLR § 308 (2). 
Mr. Chao and the DCM Defendants argue that they are not subject to personal jurisdiction in New York because there are insufficient factual allegations connecting them with the Transaction or with any New York-based activities. With respect to Mr. Chao, individually, they argue that he is not subject to personal jurisdiction in New York because he was not properly served with the summons and complaint. Specifically, the DCM Defendants argue that the plaintiffs fail to satisfy the requirements for substitute service under CPLR § 308 (2) because (i) the process server did not confirm whether DCM Ventures' receptionist was a person of suitable age and discretion, (ii) the plaintiffs never mailed to summons to Mr. Chao's place of business or to his residence in California, and (iii) the proof of service was defective because it lacked a certificate of conformity and was not properly notarized. 
First, the plaintiffs have made a sufficient showing to support long-arm jurisdiction over Mr. Chao pursuant to CPLR § 302 (a)(1). At oral argument, Mr. Chao and the DCM Defendants acknowledged that the Amended Complaint adequately pleads that they received benefits at the expense of Renren's shareholders (May 11, 2020 Tr. at 28:20-21). Therefore, under Kreutter, the remaining issue is whether there are sufficient allegations of control. 
With respect to control, the Amended Complaint sets forth in detail how Mr. Chao was inextricably linked to the Transaction and how the Separation could not have occurred without his involvement. Specifically, the plaintiffs allege that (i) Mr. Chao was an early investor in SoFi and was a SoFi director at the same time he was a Renren director (Amend. Compl., ¶¶ 71-75), (ii) Mr. Chao and the DCM Defendants had access to material, non-public information regarding SoFi's finances and business plan, which information was critical to the Transaction (id., ¶¶ 73, 115), (iii) while Mr. Chao was a director of both SoFi and Renren, with the approval of the DCM Defendants, Renren used its IPO proceeds and funds derived from the IPO proceeds to invest over $242 million in SoFi beginning in 2012 (id., ¶¶ 73-76), (iv) as "committed shareholders," Mr. Chao and the DCM Defendants committed to participate in the Private Placement before Renren's board approved the Separation (id., ¶ 101), (v) Because Renren's stake in SoFi was worth at least $560 million, the decision to pursue the Transaction was motivated by the substantial profits that Mr. Chao and the DCM Defendants stood to gain (id., ¶¶ 76, 87, 99-101, 104), (vi) the DCM Defendants (and Mr. Chao as their principal) received special distribution rights in SoFi stock as part of the Separation (id., ¶¶ 185-188), (vii) Mr. Chao voted to approve a the Share Incentive Plan, pursuant to which he received additional restricted OPI shares and options (id., ¶ 189), (viii) one month after the Separation closed, Mr. Chao stepped down as a director of Renren, which supports the inference that Mr. Chao only served as a director of Renren to leverage his influence to achieve the Separation (id., ¶¶ 26, 50), (ix) the Separation, which Mr. Chao voted to approve, also required the DCM Defendants to "use their best efforts to procure" the sale of OPI's SoFi holdings "as soon as possible" (id., ¶ 121). Critically, because the Separation Agreement required approval by Renren's full board of directors, including Mr. Chao, the plaintiffs assert that the Separation could not have occurred without Mr. Chao's participation (id., ¶¶ 152, 210). 
These allegations sufficiently establish that Mr. Chao benefited from, knew of, consented to, and exercised sufficient control over the Transaction. And the plaintiffs sufficiently allege that through his significant involvement in the Transaction, Mr. Chao "affected local commerce" [*21]in New York and "transacted business here by availing himself of modern technology to participate in and confer upon himself the benefit of the transaction while living and physically working elsewhere" (First Manhattan Energy Corp. v Meyer, 150 AD3d 521, 522 [1st Dept 2017]). Accordingly, Mr. Chao was a primary actor involved in Renren's transaction of business in New York for the purposes of CPLR § 302 (a)(1). 
In addition, for the same reasons set forth above, the DCM Defendants are subject to personal jurisdiction. Like Mr. Chao, the principal of the DCM Defendants, the plaintiffs sufficiently allege that Renren acted as the agent of the DCM Defendants in relation to the Transaction, which involved significant New York-based contacts. Critically, the plaintiffs allege that (i) the entire Transaction occurred with the DCM Defendants' knowledge and consent (Amend. Compl., ¶ 58), (ii) they directly benefitted from the Transaction (id., ¶¶ 11, 72-73, 87, 185-189), and (iii) as part of a control group holding 51.3% of Renren's shares, the DCM Defendants exercised some degree of control over Renren with respect to the Transaction (Amend. Compl., ¶ 195). Therefore, the plaintiffs have alleged a basis for personal jurisdiction over the DCM Defendants. 
Second, service of process on Mr. Chao was proper. The plaintiffs served the summons and complaint on DCM Ventures' (Mr. Chao's company) receptionist, Heidi Neri. In opposition to the DCM Defendants' motion to dismiss, the plaintiffs submit the affirmation of service of process server Jason M. Burke (NYSCEF Doc. No. 78, Burke Aff.). Mr. Burke states that he personally served the summons and complaint and supporting papers on Mr. Chao by substituted service by delivering the same "on Tuesday, September 4, 2018 at 1:49 P.M. to Heidi Neri, age 30, who was either the receptionist or person apparently in charge at DCM Ventures" (id., ¶ 3). In her affidavit in support of the DCM Defendants' motion to dismiss, Ms. Neri states that she is "employed as an administrative assistant and front-desk receptionist at DCM Ventures" (NYSCEF Doc. No. 77, Neri Aff., ¶ 1). She further states that her responsibilities include the "receipt and distribution within DCM Ventures of incoming mail" (id., ¶ 6). 
Based on the foregoing, leaving the papers with Ms. Neri constituted proper service on Mr. Chao. Ms. Neri, whose age was noted by Mr. Burke to be 30, was responsible for receiving deliveries and would be expected to deliver the papers to Mr. Chao. "Indeed, leaving such papers with a receptionist . . . has been upheld to be valid service precisely because the job of such individual includes taking messages and accepting deliveries, and such person may reasonably be expected to convey the message or papers to the intended party" (Charnin v Cogan, 250 AD2d 513, 518 [1st Dept 1998]). In addition, a receptionist with authority to accept deliveries is considered a person of suitable age and discretion for the purposes of CPLR § 308 (2) (id. at 517-518; see F.I. duPont, Glore Forgan & Co. v Chen, 41 NY2d 794, 795, 797, [1977] [explaining that doorman whose duties include accepting messages and packages for delivery to tenants qualifies as person of suitable age and discretion for purposes of alternative service under CPLR § 308 (2)]). To the extent that the DCM Defendants argue that service was defective because Ms. Neri was not authorized to accept service on Mr. Chao's behalf, the argument fails. As the First Department has observed, "authority is not a relevant criterion with respect to service on individuals" (City of New York v VJHC Dev. Corp., 125 AD3d 425, 425 [1st Dept 2015]).
As Mr. Chao and the DCM Defendants' argument that service was defective because the plaintiffs failed to mail the summons and complaint to Mr. Chao's place of business or his residence in California, the argument is similarly unavailing. In his affidavit of service, Mr. Burke states that he "mailed a copy of those documents on September 5, 2018 to David Chao's attention at DCM Ventures at 2420 Sand Hill Road, Suite 200, Menlo Park, California" (NYSCEF Doc. No. 78, Burke Aff., ¶ 3). And, significantly, Mr. Chao does not personally deny that he received the papers by mail. Although Ms. Neri states that she "has no knowledge" of the papers "ever having been mailed," (NYSCEF Doc. No. 77, Neri Aff., ¶ 6), her conclusory denial is insufficient to rebut the presumption of valid service established by the affidavit of service (HSBC Bank USA v Daniels, 163 AD3d 639, 641 [1st Dept 2018]).
And, inasmuch as the DCM Defendants challenge the affidavit of service on the ground that it was taken in California but was not accompanied by a certificate of conformity, this defect has been cured as the plaintiffs have filed a superseding affidavit of service with a certificate of conformity (NYSCEF Doc. No. 117), which the court deems properly filed nunc pro tunc (Bank of New York v Singh, 139 AD3d 486, 487 [1st Dept 2016] [holding that failure to include certificate of conformity can be corrected nunc pro tunc by filing providing a new conforming affidavit]). Accordingly, the plaintiffs properly served Mr. Chao under CPLR § 308 (2).
In addition, the exercise of personal jurisdiction over Mr. Chao and the DCM Defendants comports with due process. As with Mr. Chen, Mr. Chao has sufficient minimum contacts with New York to satisfy constitutional due process requirements as a primary actor involved in Renren's transaction of business in New York. As set forth above, Mr. Chao's involvement was crucial to Renren's ability to complete the Transaction and achieve the Separation, and the entire Transaction was imbued with New York-based contacts. Most significantly, Renren, with Mr. Chao's participation, improperly steered the IPO Proceeds to help launch SoFi, despite their significant conflicts of interest arising from their personal interests in SoFi. In addition, Mr. Chao, on behalf of Renren, used New York's legal and banking systems to effectuate the Transaction. And, because the plaintiffs allege that the DCM Defendants' also benefited from, knew of and consented to, and exercised some degree of control over Renren with respect to the Transaction along with Mr. Chao, they have alleged sufficient minimum contacts with New York for the exercise of jurisdiction over them to comport with due process. And, the New York contacts are substantially related to the claims in this case. In short, without the numerous New York contacts that were involved in the Transaction, it could not have occurred.
Based on the foregoing, the plaintiffs have sufficiently alleged that Mr. Chao and the DCM Defendants availed themselves of the benefits of doing business in New York and should have reasonably anticipated being haled into court here (Burger King Corp., 471 US at 474-475). In addition, and for the reasons set forth above, the exercise of personal jurisdiction over Mr. Chao and the DCM Defendants comports with traditional notions of fair play and substantial justice, and Mr. Chao and the DCM Defendants have failed to meet their burden in demonstrating that the exercise of personal jurisdiction over them would be unreasonable (D & R Glob. Selections, 29 NY3d at 299-300).
iv. The Court Has Long Arm Jurisdiction Over OPI
OPI argues that the complaint fails to allege that OPI transacted any business in New York, and in any event, the knowing receipt cause of action asserted against it does not arise out of any alleged New York-based activities. OPI further argues that the court does not have personal jurisdiction over it because it lacks the minimum contacts with New York required to satisfy due process.
The plaintiffs argue that the court has personal jurisdiction over OPI because it projected itself into New York in connection with the Private Placement and the Separation and purposefully availed itself of the privileges of doing business in New York. 
Here, the plaintiffs have met their burden in establishing that OPI is subject to personal jurisdiction in New York. As alleged in the Amended Complaint, OPI's Private Placement targeted New York investors holding Renren ADS issued on the NYSE, who were required to transmit an offer acceptance form and a Cash Dividend Waiver Election Form to Renren's counsel's offices in New York City (Amend. Compl., ¶ 42). ADS holders were required to pay a fee of $0.05 per ADS by wire to a Citibank account in New York or through the Depository Trust Company's ATOP system in New York (id.). In addition, OPI was Renren's counterparty in the Separation Agreement which, as discussed above, is governed by New York law, and because OPI received Renren's shares of SoFi through the Separation, regulatory approval from DFS was an express condition precedent to the deal (id., ¶¶ 41-44). As discussed at length above, these New York contacts are not incidental. The entire structure of the Transaction was purposeful and necessarily involved New York-based connections, including the use of New York's capital markets, legal and banking systems, and laws. 
In addition, the plaintiffs have established an articulable nexus between the knowing receipt claim asserted against OPI and the Transaction, which involved significant New York activities. The plaintiffs' knowing receipt claim is based on the allegation that OPI improperly received Renren's assets, including its stake in SoFi. Because the transfer of those assets occurred as a result of the Transaction, the knowing receipt claim is substantially related to OPI's New York activities.
In addition, for the same reasons set forth above, the exercise of personal jurisdiction over OPI comports with due process. OPI had significant New York contacts relating to the Transaction. By using New York's capital markets, legal and banking systems, and laws, OPI purposefully availed itself of the privileges of doing business in New York. And because the operative agreements, including the Separation Agreement, were governed by New York law, OPI could reasonably expect to be haled into court here. Finally, the exercise of jurisdiction over OPI does not offend traditional notions of fair play and substantial justice, and OPI fails to meet its burden in demonstrating that the exercise of personal jurisdiction over it would be unreasonable (D & R Glob. Selections, 29 NY3d at 299-300).
D. Derivative Standing under Cayman Law
i. The Plaintiffs Have Standing under Cayman Islands Law to Assert Claims on Behalf of Renren
Pursuant to the internal affairs doctrine, New York courts look to the substantive law of the place of incorporation to determine whether a plaintiff has standing to bring a derivative suit on behalf of a corporation (see Galef v Alexander, 615 F 2d 51, 58 [2d Cir 1980]). Renren is incorporated in the Cayman Islands, so Cayman Islands law governs the issue of derivative standing in this case. Cayman Islands law follows the English common law rule set forth in Foss v Harbottle (2 Hare 461 [1843]). "Under Cayman Islands law interpreting Foss, 'derivative claims are owned and controlled by the company, not its shareholders'" (Davis v Scottish Re Group Ltd., 160 AD3d 114, 116 [1st Dept 2018], quoting Winn v Schafer, 499 F Supp 2d 390, 396 [SD NY 2007]). In other words, as a rule, shareholders are not permitted to bring derivative actions on behalf of a company (Shenwick v HM Ruby Fund, L.P., 106 AD3d 638, 639 [1st Dept 2013]). 
"Cayman Islands law recognizes only four narrow exceptions to the Foss rule: '(1) if the conduct infringed on the shareholder's personal rights; (2) if the conduct would require a special majority to ratify; (3) if the conduct qualifies as a fraud on the minority; or (4) if the conduct consists of ultra vires acts'" (Davis, 160 AD3d at 116, quoting Winn, 499 F Supp 2d at 396). The only exception at issue in this case is the "fraud on the minority exception." As the First Department has explained, "[i]n order to invoke that exception, plaintiff must plead and prove that the alleged wrongdoers controlled a majority of the stock with voting rights and that those wrongdoers committed fraud" (Davis, 160 AD3d at 116). 
As the English Court of Appeal has observed, the relevant inquiry with respect to the element of control as it relates to the fraud on the minority exception is whether the alleged wrongdoers have the power to block the company from bringing a claim against them (Barrett v Duckett, [1995] 1 BCLC 243, 249i-250a). The Grand Court of the Cayman Islands has adopted this standard (Top Jet Enter. Ltd. v Sino Jet Holding Ltd. and Jet Midwest Inc., 2018 (1) CILR 18, 43, [34] ["The principle applies whenever a shareholder is not able to persuade or cause the normal organs of the company to commence proceedings in respect of the wrong done to it"]). And, the element of fraud may be established where the wrongdoers committed a deliberate and dishonest breach of duty, or where the wrongdoers derived a personal benefit at the expense of the company's shareholders (Harris v Microfusion 2003-2 LLP, [2016] EWCA Civ 1212, [34], [35]).
Renren argues that the plaintiffs fail to plead the element of fraud because they fail to allege that the defendants engaged in self-dealing to benefit themselves at the company's expense. Renren further argues that the plaintiffs cannot establish that the Director Defendants caused Renren to enter into the Transaction because the Special Committee had the "full power" to "ultimately approve or not approve the Transaction" (NYSCEF Doc. No. 83 at 17). It contends that even if the Director Defendants participated in the vote before the full board to approve the Transaction, this does not constitute self-dealing because they were allowed to participate in the vote under Renren's the Articles of Association and they were only two of seven board members, meaning they could not have approved the Transaction by themselves. 
In support of its motion to dismiss, Renren submits the Expert Affirmation of Thomas Lowe QC (the Lowe Aff., NYSCEF Doc. No. 70). According to Mr. Lowe, before allowing a [*22]shareholder derivate action to proceed under Cayman Law, the court must first undertake a careful assessment of the merits of the claims and determine whether the plaintiff has established a prima facie case that the company is entitled to the relief sought, and the action falls within one of the recognized exceptions to the rule as stated in Foss v Harbottle (Lowe Aff., ¶ 26). He states that to invoke the fraud on the minority exception, a plaintiff must make a preliminary showing of (i) a breach of duty amounting to a "fraud' and (ii) wrongdoer control (id., ¶ 27).
Mr. Lowe concedes that because the Director Defendants and SoftBank are alleged to control more than 50% of Renren's shares, the element of control is satisfied with respect to these parties (id., ¶ 28). But Mr. Lowe states that, in his opinion, it is unclear from the Amended Complaint what the Director Defendants are alleged to have done or omitted to do that would constitute a breach of duty or how they "caused" the company to enter into the Transaction (id., ¶ 35). Specifically, with respect to the Private Placement and Cash Dividend, Mr. Lowe reasons that all shareholders were entitled to an equal distribution, as non-eligible shareholders received cash distributions of equal value to the in specie dividends received by the Eligible Shareholders through the Private Placement (id., ¶ 18). Mr. Lowe states that the Transaction was fair to all shareholders, because the Director Defendants, and SoftBank waived their entitlement to receive cash dividends in satisfaction of a separate obligation to pay the price of the OPI shares "provided that the price was fair" (id., ¶ 19).
In their opposition papers, the plaintiffs argue that the element of control is satisfied because the Director Defendants, the DCM Defendants, Mr. Liu, and Softbank collectively hold more than 50% of Renren's voting shares and could therefore block an action from being brought against them. The plaintiffs further argue that the element of fraud is satisfied for the purposes of derivative standing as the Director Defendants received significant financial benefits at the expense of Renren as a result of the Transaction that they strategically structured and voted to approve. The plaintiffs argue that by doing so, the Director Defendants looted Renren's investments, including its substantial SoFi holdings, enhanced their control, and obtained special distribution rights. 
In support of their position, the plaintiffs submit the Consolidated Expert Affirmation of Felicity Toube QC and Dr. Riz Mokal (the Toube Aff., NYSCEF Doc. No. 152). First, Ms. Toube and Dr. Mokal explain that the court's role at this stage of the proceedings under Cayman Law is to filter out cases that are, on their face, (1) unfounded, (2) not brought in good faith or on reasonable grounds, (3) not brought on the company's behalf, or (4) lacking in evidentiary support, but that courts should not go beyond this filtering role to examine the ultimate merits of the case with incomplete evidence (Toube Aff., ¶ 42). Stated otherwise, the court's role at this stage in the proceedings is to determine whether the plaintiffs have stated a prima facie case, not to conduct a mini trial on the merits.
Second, Ms. Toube and Dr. Mokal explain that fraud can be established where the wrongdoer is alleged to have benefited in some way, which may include allegations that the conduct was done to maintain the support of the shareholders, retain seats on the board, or even to please the chairman who has influence over the wrongdoer's future employment or career [*23]prospects (id., ¶¶ 20, 43.1). Importantly, where a deliberate and dishonest breach of duty is alleged, the plaintiffs need not allege that the wrongdoer derived a direct benefit from his or her wrong (id., ¶¶ 21, 43.2). 
According to Ms. Toube and Dr. Mokal, the Amended Complaint sets forth allegations which, if proven, would establish at least four breaches of duty with respect to the Director Defendants by: (1) breaching the duty of loyalty, (2) placing themselves in a position where their duty to Renren conflicted with their own personal interest, (3) making an improper gain from their fiduciary positions, and (4) using their fiduciary powers for an improper purpose (id., ¶ 25). They further explain that to establish improper exercise of the Board's powers, it is sufficient to allege that the board would not have made the decision in question without the concurrence of the wrongdoers (id., ¶ 26). 
Based on the allegations set forth above, at this stage of the proceeding, the plaintiffs have met their burden in establishing that they have standing pursuant to the fraud on the minority exception. Simply put, the element of control is established by the plaintiffs' allegations that the defendants collectively hold de facto control over a majority of the voting shares or blocking control and could prevent shareholders from bringing a derivative suit against them. The element of fraud is satisfied as the plaintiffs sufficiently allege that the Director Defendants derived personal financial benefits from the Transaction, which they orchestrated to their advantage, and that the Board could not have approved the Transaction without the participation of the Director Defendants. 
For the avoidance of doubt, to the extent that Renren argues that the Director Defendants are insulated from liability by the Special Committee and the Special Committee did not receive a direct benefit, the argument fails. 
Renren relies on the Expert Affirmation of Mr. Lowe for the proposition that there was no breach of duty because the disinterested Special Committee had the full authority to approve the transaction, Mr. Lowe explains that "[t]he involvement of a Special Committee is generally understood to enable a Company to show that a transaction was concluded by it with care and independently" (Lowe Aff., ¶ 44). He states that the Board was entitled to rely on the Special Committee, and the Special Committee was entitled to rely on the Duff & Phelps valuation and fairness opinion (id., ¶ 41). And Mr. Lowe further states that there are no allegations that the "disinterested" directors received personal benefits from approving the Transaction (id., ¶ 42). 
Mr. Lowe acknowledges that the Amended Complaint alleges that Ms. Huang and Mr. Tappin had connections with Mr. Chen prior to serving on the Special Committee, but he states that these allegations are insufficient to render them "interested" in the Transaction (id., ¶ 42, n 2). And in any event, Mr. Lowe states that it is not enough to allege that directors or Special Committee members were not "independent," because there must also be allegations that they benefited financially and improperly to be considered "interested" directors (id., ¶ 45). 
In other words, the Director Defendants are alleged to have received a benefit from the Transaction, but they are only two directors of the full Board, the majority of whom were, in Mr. [*24]Lowe's view, disinterested, and in any event, the Special Committee approved the Transaction, not the Director Defendants, and there are insufficient allegations to support the inference that the disinterested directors and Special Committee members derived financial benefits at the expense of Renren's shareholders (id., ¶ 48). 
However, the plaintiffs' experts, Ms. Toube and Dr. Mokal, assert that the Special Committee cannot be seen as acting with sufficient independence because the plaintiffs allege that two of its members were beholden to Mr. Chen (Toube Aff., ¶ 27). And, they further state that the Special Committee fell far short of its fiduciary obligations by relying on the Duff & Phelps opinion (id., ¶ 28). Specifically, they explain that the Special Committee could not have undertaken due care to assess Duff & Phelps' suitability prior to engaging it because Duff & Phelps was engaged by the Board on the same day that the Special Committee was formed (id., ¶ 89.1). In addition, among other red flags, the extraordinarily narrow scope of Duff & Phelps' analysis and its failure to solicit indications of interest from third parties to directly assess market value, and the express disclaimer that the analysis was not a valuation opinion, should have put the Special Committee on notice that further enquiries were necessary, yet no action was taken (id., ¶ 89.2). Finally, they analyze the Board and its connections to Mr. Chen and question its independence. Accordingly, Ms. Toube and Dr. Mokal assert that the existence of the Special Committee is no defense for the Director Defendants. The court agrees.
The gravamen of the plaintiffs' allegations are that the formation of the Special Committee was a "sham" and the Special Committee's approval of the Transaction was a "sham" as the members of the Special Committee were "hand-picked" by Mr. Chen and were neither qualified nor independent. As alleged in the Amended Complaint, one of the Special Committee members was Mr. Tappin, who was Mr. Chen's "CEO coach" and close friend, who lacked any relevant experience (Amend. Compl., ¶¶ 136-138). Another of Mr. Chen's appointments to the Special Committee was Ms. Huang, who formerly served as CFO under Mr. Chen and continued to serve as a shareholder of several of Renren's Chinese subsidiaries during the period of the Transaction and "financially benefited from her ongoing relationship with" Mr. Chen (id., ¶ 141). 
The plaintiffs also allege that the Special Committee's valuation of OPI was based on a flawed valuation from Duff & Phelps. Notably, the plaintiffs allege that it is suspect that Special Committee somehow arrived at a valuation for OPI that was exactly the same as Mr. Chen's proposed offer to take Renren private; a valuation that was patently unreasonable based on the allegations in the Amended Complaint and as described in haec verba above. In short, the plaintiffs' allegations support the inference that the Special Committee was not sufficiently independent in its decision making. In any event, the Special Committee did not have "full power" to approve the Separation. Pursuant to the Separation Agreement, the Separation required full board approval (NYSCEF Doc. No. 123, § 2.4 [a]). And as alleged in the Amended Complaint, five of seven directors were conflicted in that they financially benefited from the Separation, and the board itself was controlled by Mr. Chen and Mr. Chao. In other words, despite Mr. Lowe's indication to the contrary that the Special Committee could approve the transaction, final approval required the full Board, and the Separation could not have been achieved without the participation of the interested directors and, in particular, the Director [*25]Defendants.
As directors, the members of the Special Committee owed fiduciary duties to Renren and, as alleged, they breached their duties by delegating the valuation authority to Duff & Phelps without exercising due care and accepting Duff & Phelps' analysis without further inquiry and took no action to test the fair value. Therefore, as alleged, the involvement of the Special Committee in approving the Transaction does not absolve the Director Defendants of anything.
To the extent that Renren argues that any alleged breaches of duty by the members of the Special Committee cannot give rise to derivative standing because they did not receive a direct financial benefit, the argument fails. A benefit other than a financial interest may be sufficient (Toube Aff., ¶ 45). First, as explained above, because the plaintiffs allege deliberate and dishonest breaches of duty, no personal benefit to the wrongdoer is required (id., ¶ 46). Second, in cases in which no actual fraud or ultra vires acts are alleged, a personal benefit to the wrongdoer is required, but it need not be financial; any personal benefit to the wrongdoer is sufficient (id., ¶ 47). This may include, for example, acting in accordance with one's political convictions (Estmanco (Kilner House) Ltd. v Greater London Council, [1982] 1 WLR 2, 13). 
Therefore, to the extent that Mr. Lowe posits that in the absence of a deliberate and dishonest breach of duty the wrongdoer must have derived a personal financial benefit at the expense of the company (Lowe Aff., ¶¶ 31, 45), this is an incomplete statement of the law. Certainly a financial self-interest will suffice, but as Estmanco establishes, and as affirmed by the English Court of Appeal in Harris, other benefits derived at the expense of the company, including maintaining seats on the board of directors or advancing career prospects may also be sufficient to invoke the fraud on the minority exception (Harris, [2016] ECWA Civ, [29]; Abouraya v Sigmund, [2014] EWHC 277 Ch, [23]). Here, the allegations in the Amended Complaint support the inference, at the very least, that the directors, including, specifically, the members of the Special Committee, acted to benefit Mr. Chen, and by doing his bidding, received directorships, possible career advancement, and compensation. These are sufficient benefits for the purposes of the fraud on the minority exception to establish standing. 
For completeness, the defendants argue that the decision of the Grand Court of the Cayman Islands in Renova Resources Private Equity Ltd v Gilbertson ([2009] CILR 268), on which the plaintiffs rely for the proposition that the controlling shareholders need not derive a benefit if the alleged conduct involved a deliberate and dishonest breach of duty is inapposite because in that case, there was no Special Committee, as there is in this case. The defendants further argue that based on Harris, which they contend stands for the proposition that a plaintiff must allege that the fiduciary defendant was self-interested in receiving a personal financial benefit from the subject transaction where a subset of directors has the authority to control a transaction, i.e., like the Special Committee here, standing cannot be established. As discussed above, however, the argument fails.
The court in Harris did not hold that the element of fraud could only be established by alleging that the fiduciary derived a personal benefit. Rather, having first determined that there [*26]were no allegations of a deliberate and dishonest breach of duty, the court reasoned that the only relevant question was whether there were sufficient allegations of personal benefit (id. at [17], [34]-[35]). Finding no allegations of personal benefit, the court held that the case did not fall within the fraud on the minority exception (id. at [37]). In other words, even where the board of directors appoints a special committee, the element of fraud may be properly satisfied by alleging that (1) there was a deliberate and dishonest breach of duty, or (2) the wrongdoers derived a personal benefit. Here, the plaintiffs have alleged both. 
The allegations of deliberate and dishonest breaches of duty of the Director Defendants and DCM Defendants leap off the pages of the Amended Complaint, including, without limitation: (i) they raised $777 million in an IPO and deployed that capital in violation of the underlying agreements by making significant investments in other companies and funds, including sizable investments in SoFi, (ii) the Director Defendants were conflicted as they were also directors of and investors in SoFi, (iii) having had their going private transaction rejected, they structured a transaction (a) that allowed them to strip all of the valuable assets out of Renren for a song, (b) limited the eligibility of minority shareholders to participate so as to freeze them out, (c) put together a Special Committee of unqualified or conflicted directors to approve the Transaction, (d) had Duff & Phelps put together a valuation which had a cash dividend price at the price originally offered in the going private transaction that had been rebuked and (e) diluted the few that could participate through a Share Incentive Plan allocating extra shares to themselves. Put another way, the argument that there are insufficient allegations that the Director Defendants and the DCM Defendants derived a personal benefit at the expense of Renren's minority shareholders is simply wrong. The Amended Complaint specifically alleges that they pre-committed to the Separation and in exchange, they increased their effective ownership in Renren's investment portfolio, received the rights to receive special distributions of SoFi shares, plus an additional distribution of SoFi shares from OPI after the SoftBank Loan is repaid, and Mr. Chao personally received restricted OPI shares and options that minority shareholders did not receive through the Share Incentive Plan that he voted to approve (Amend. Compl., ¶¶ 10, 101, 185-189).
Moreover, Mr. Chao and the DCM Defendants argue that the plaintiffs cannot bring an action under the fraud on the minority exception because they do not control a majority of shares and there are insufficient allegations that they acted in concert with Mr. Chen to justify grouping their collective shares together. The argument misses the point. The wrongdoers themselves need not have direct control to be sued in a derivative action under the fraud on the minority exception. It is sufficient that one defendant has blocking control over Renren, or that some or all of the defendants collectively have such control (Abouraya, [2014] EWHC 277 Ch, at [17]; Renova, [2009] CILR 268, 274-5, at [4]-[6]). Significantly, a plaintiff may bring a derivative action against a third party that either participated in or was an accessory to the conduct constituting relevant breach of duty, even where the third party did not exercise any control (see Top Jet Enter., 2018 (1) CILR 18, 47 at [39]; Toube Aff., ¶ 66.2). 
As discussed above, Mr. Chen, Mr. Chao, and the DCM Defendants collectively hold more than 50% of Renren's voting shares and, consequently, have the power to challenge derivate claims brought against them. Renren's opposition to this suit, which is brought on its [*27]behalf, is evidence of this fact. In addition, Mr. Chao and the DCM Defendants' participation in the Transaction, which gives rise to the allegations of breaches of duty, are more than adequately alleged here.
Significantly, the argument that Mr. Chao and the DCM Defendants acted in conjunction with Mr. Chen to influence the Special Committee and exert control over the Transaction finds ample support in the pleadings (Amend. Compl., ¶¶ 1, 10-12, 15-16, 18, 20, 40, 99-104, 201-208). As the managing member of the DCM Funds' general partner, Mr. Chao had control over the DCM Defendants' voting shares (id., ¶¶ 27-28). Renren's 2017 Form 20-F filings reveal that Mr. Chao is the beneficial owner of 90 million Renren shares representing 2.4% of its voting power (NYSCEF Doc. No. 168 at 103), and that Mr. Chao has shared power to vote and dispose of the DCM Defendants' shares in Renren (id. at 104, n 13). The Amended Complaint alleges that Mr. Chao and the DCM Defendants signed on as "Committed Shareholders" before the Separation was announced and received special benefits that minority shareholders did not receive (Amend. Compl., ¶¶ 10, 101, 186-188). In short, the Amended Complaint alleges that Mr. Chao, individually, as a Locked-Up Person from the IPO, and through his control of the DCM Defendants, voted to approve the Transaction, and directly participated in designing the structure of the Transaction, in partnership with Mr. Chen. These allegations support the inference that Mr. Chao and the DCM Defendants were part of the pre-planning of the Transaction, in which the interested controlling shareholders first pre-determined that they were going to loot Renren's assets for their own benefit, and then figured out exactly how to achieve that goal.
Accordingly, the plaintiffs have derivative standing and those portions of Renren, OPI, Mr. Chao, and DCM Defendants' motions to dismiss for lack of standing pursuant to CPLR § 3211 (a) (3) are denied.
ii. The Plaintiffs Have Standing to Assert Their Derivate Claims Against Duff & Phelps
Under Cayman Islands law, in a derivative action against a third-party other than the wrongdoer under the fraud on the minority exception, the plaintiff must establish that the third party directly participated in or was an accessory to the conduct of the controlling stockholders constituting the alleged breach of duty (Top Jet Enter., 2018 (1) CILR at 47). As the Grand Court of the Cayman Islands has observed, "[a]s dishonesty is a serious allegation, it is not to be pleaded lightly" (Ritter and Geneva Ins. SPC Ltd. (in Voluntary Liquidation) v Butterfield Bank (Cayman) Limited, 2018 (1) CILR 529, 604). Where dishonest assistance is alleged, the pleading must identify and particularize the nature of the third party's conduct in assisting the breach of fiduciary duty, how the assistance caused the plaintiff's loss, and how the third party acted dishonestly in assisting the primary perpetrator of the fraud (id. at 600-601).
Here, Duff & Phelps argues that the plaintiffs do not have standing to assert a claim for dishonest assistance against it under Cayman Islands law because there can be no standing to assert a claim against a third party in a derivative action where there is no standing as to the primary defendants. In other words, Duff & Phelps argues that the plaintiffs lack standing to assert derivative claims on behalf of Renren against the primary defendants, therefore they lack [*28]standing to sue a third party for dishonest assistance. Duff & Phelps further argues that the Amended Complaint fails to allege with sufficient particularity that Duff & Phelps was so closely connected to Renren's controlling stockholders such that it may be deemed to have participated in and benefited from their actions, and that there are no allegations that it exercised control over Renren with respect to the Transaction. 
In their opposition papers, the plaintiffs argue that they have standing to assert their breach of fiduciary duty claims against the primary defendants, so the argument that they lack standing to sue a third party for dishonest assistance fails. The plaintiffs further argue that the Amended Complaint sufficiently establishes the elements of dishonest assistance necessary to establish derivative standing to sue Duff & Phelps on behalf of Renren. In particular, the plaintiffs argue that they sufficiently allege that Duff & Phelps acted as an accessory to the Director Defendants' breaches of fiduciary duty by knowingly presenting the Special Committee with an improper valuation of OPI's assets and thus giving the Transaction the shroud of fairness. 
In addition, the plaintiffs' experts, Ms. Toube and Dr. Mokal, explain that in order to bring a derivate action against a third party other than the wrongdoer who breached a duty to the company, a plaintiff must establish that the third party was either an accessory to or closely associated with the relevant breach of duty (Toube Aff., ¶ 29). They conclude that based on the allegations in the Amended Complaint, Duff & Phelps, the DCM Defendants, and OPI each satisfy this condition (id., ¶ 30). The court agrees.
The plaintiffs have sufficiently pleaded that the Director Defendants committed a fraud and caused Renren to enter into the Transaction with the knowing assistance of Duff & Phelps. Specifically, the Amended Complaint alleges that Duff & Phelps assisted the Special Committee in "rubber-stamping" the proposed Transaction and valuation of OPI, which the plaintiffs assert was a "complete sham" (Amend. Compl., ¶¶ 135-152). The plaintiffs allege that rather than retaining its own independent financial advisor, the Special Committee used Duff & Phelps, which was chosen by Renren's management (and specifically by Mr. Chen) (id., ¶¶ 135, 153). Significantly, the plaintiffs allege that Duff & Phelps' analysis was severely limited on its face and failed to address the substance of the transaction (id., ¶¶ 158-163). In particular, the plaintiffs contend that Duff & Phelps' analysis was improperly based on data and assumptions provided by Renren's management, which Duff & Phelps merely accepted without independent verification (id., ¶ 161). Ultimately, the plaintiffs allege that Duff & Phelps assisted in Mr. Chen, Mr. Chao, and the Special Committee's breach of their fiduciary duties to Renren by providing a valuation and fairness opinion that was reverse engineered to justify the desired price, grossly undervalued Renren's assets, and falsely stated that the Cash Dividend was fair (id., ¶ 229). The plaintiffs assert that Duff & Phelps knew, or suspected and ignored, that (1) by enabling or facilitating the Transaction, they were effectively assisting the Director Defendants and the Special Committee in conduct constituting a breach of their fiduciary duties, (ii) they were retained solely to "create ex post rationalization of a pre-ordained value placed on OPI irrespective of OPI's true value," and (iii) the unsound basis, narrow scope, qualifications, methodology, and reliance on information provided by the Renren board render the opinion unfit for its purpose (id., ¶ 231). 
Accordingly, Duff & Phelps has failed to meet its burden to demonstrate a lack of standing as a matter of law, and its motion to dismiss is denied.
Accordingly, it is
ORDERED that Renren's motion to dismiss (Mtn. Seq. No. 006) is denied; and it is further
ORDERED that Mr. Chao and the DCM Defendants' motion to dismiss (Mtn. Seq. No. 007) is denied; and it is further
ORDERED that Duff & Phelps' motion to dismiss (Mtn. Seq. No. 008) is denied; and it is further
ORDERED that Mr. Chen's motion to dismiss (Mtn. Seq. No. 009) is denied; and it is further
ORDERED that OPI's motion to dismiss (Mtn. Seq. No. 010) is denied; and it is further
ORDERED that the defendants shall respond to the Amended Complaint within 30 days of this decision and order. 
Date: 5/20/2020